MANDATE

**UNITED STATES COURT OF APPEALS**
**FOR THE**
**SECOND CIRCUIT**

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 4th day of November, two thousand twenty-one.

Before:     John M. Walker, Jr.,
            Robert D. Sack,
            Susan L. Carney,
                 *Circuit Judges.*

---

| | |
|---|---|
| We The Patriots USA, Inc., Diane Bono, Michelle Melendez, Michelle Synakowski, | **JUDGMENT** |
| | Docket No. 21-2179 |
|          Plaintiffs-Appellants, | |
| v. | |
| Kathleen Hochul, Howard A. Zucker, M.D., | |
|          Defendants-Appellees. | |

---

The appeal in the above captioned case from a judgment of the United States District Court for the Eastern District of New York was argued on the district court's record and the parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that order of the district court is AFFIRMED and the case remanded for further proceedings consistent with the Order entered by this Court on October 29, 2021 and the Court's Opinion issued on November 4, 2021.

For the Court:

Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

MANDATE ISSUED ON 12/03/2021

# In the
# United States Court of Appeals
## For the Second Circuit

---

August Term, 2021

(Argued: October 27, 2021   Decided: November 4, 2021)

Docket No. 21-2179

---

WE THE PATRIOTS USA, INC., DIANE BONO, MICHELLE MELENDEZ,
MICHELLE SYNAKOWSKI,

*Plaintiffs-Appellants,*

–v.–

KATHLEEN HOCHUL, HOWARD A. ZUCKER, M.D.,

*Defendants-Appellees.*

---

Docket No. 21-2566

---

DR. A., NURSE A., DR. C., NURSE D., DR. F., DR. G., THERAPIST I.,
DR. J., NURSE J., DR. M., NURSE N., DR. O., DR. P., TECHNOLOGIST P., DR. S.,
NURSE S., PHYSICIAN LIAISON X.,

*Plaintiffs-Appellees,*

–v.–

KATHY HOCHUL, GOVERNOR OF THE STATE OF NEW YORK, IN HER OFFICIAL
CAPACITY, DR. HOWARD A. ZUCKER, COMMISSIONER OF THE NEW YORK STATE

DEPARTMENT OF HEALTH, IN HIS OFFICIAL CAPACITY, LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK, IN HER OFFICIAL CAPACITY,

*Defendants-Appellants.*

B e f o r e :

WALKER, SACK, and CARNEY, *Circuit Judges.*

_____

 In these two cases on appeal, district courts in New York State considered applications for preliminary injunctive relief that would restrain the State from enforcing its emergency rule requiring healthcare facilities to ensure that certain employees are vaccinated against COVID-19. *See* 10 N.Y.C.R.R. § 2.61 (Aug. 26, 2021) ("Section 2.61"). The State issued Section 2.61 in response to rapidly increasing infection rates related to the Delta variant of the virus. Section 2.61 contains an exemption for employees who are unable to be safely vaccinated due to pre-existing medical conditions, but does not contain an exemption for those who object to this vaccination on religious grounds. Plaintiffs, individual healthcare workers who object to receiving the vaccine because of their religious beliefs, as well as a membership organization, filed complaints and motions for preliminary injunctive relief, asserting that Section 2.61 violates their rights under the First Amendment, the Fourteenth Amendment, and the Supremacy Clause. In *We The Patriots*, filed in the U.S. District Court for the Eastern District of New York, the district court (Kuntz, *J.*) denied the motion without opinion. In *Dr. A.*, filed in the U.S. District Court for the Northern District of New York, the district court (Hurd, *J.*) granted the motion, deciding that Plaintiffs had established that Section 2.61 was likely neither neutral towards religion nor generally applicable, triggering strict scrutiny under the First Amendment's Free Exercise Clause, and that the State had failed to establish that Section 2.61 was likely narrowly tailored to serve a compelling government interest under strict scrutiny review. The district court in *Dr. A.* also concluded that Section 2.61 was likely preempted by Title VII's protection for employees who require religious accommodations, and thus ran afoul of the Supremacy Clause.

 On appeal, focusing on the requirements for the grant of a preliminary injunction, we conclude that Plaintiffs in both cases have failed to establish a likelihood

of success on any of their claims, and thus the *Dr. A.* district court's issuance of a preliminary injunction was in error. As to Plaintiffs' Free Exercise claims, we conclude that Plaintiffs have not shown that they are likely to succeed in establishing (1) that Section 2.61 is not a neutral law of general applicability, or (2) that—in the resulting inquiry—Section 2.61 does not satisfy rational basis review. Next, we determine that Plaintiffs have not demonstrated a likelihood of success on their Supremacy Clause claim: it appears to us fully possible for employers to comply with both Section 2.61 and Title VII. Finally, we decide that Plaintiffs are not likely to succeed on their claims that Section 2.61 contravenes the Fourteenth Amendment. The order of the U.S. District Court for the Eastern District of New York is therefore AFFIRMED, the order of the U.S. District Court for the Northern District of New York is REVERSED, and the preliminary injunction entered by that court is VACATED. These tandem cases are REMANDED to their respective district courts for further proceedings consistent with the Order entered by this Court on October 29, 2021, and this Opinion.

———————

CAMERON L. ATKINSON (Norman A. Pattis, Earl A. Voss, *on the brief*), Pattis & Smith, LLC, New Haven, CT, *for Plaintiffs-Appellants We The Patriots USA, Inc. et al. (in No. 21-2179).*

STEVEN C. WU, Deputy Solicitor General (Barbara D. Underwood, Mark S. Grube, *on the brief*) *for* Letitia James, Attorney General for the State of New York, New York, NY, *for Defendants-Appellants (in No. 21-2566) and Defendants-Appellees (in No. 21-2179) Kathleen Hochul et al.*

CHRISTOPHER A. FERRARA (Michael McHale, Stephen M. Crampton, *on the brief*), Thomas More Society, Chicago, IL, *for Plaintiffs-Appellees Dr. A. et al. (in No. 21-2566).*

Alex J. Luchenister, Richard B. Katskee, Americans United for Separation of Church and State, Washington, D.C.; Daniel Mach, Heather L. Weaver, Lindsey Kaley,

American Civil Liberties Union Foundation, Washington, D.C. & New York, NY; Christopher Dunn, Beth Haroules, Arthur Eisenberg, Amy Belsher, New York Civil Liberties Union Foundation, New York, NY, *for Amici Curiae (in No. 21-2179) Americans United for Separation of Church and State, American Civil Liberties Union, New York Civil Liberties Union, Central Conference of American Rabbis, Global Justice Institute, Metropolitan Community Churches, Men of Reform Judaism, Methodist Federation for Social Action, Muslim Advocates, National Council of Jewish Women, Reconstructionist Rabbinical Association, Union for Reform Judaism, and Women of Reform Judaism.*

Mark D. Harris, Shiloh Rainwater, Proskauer Rose LLP, New York, NY, *for Amicus Curiae (in No. 21-2179) Greater New York Hospital Association.*

———————

PER CURIAM:

In these two cases on appeal, which we consider in tandem, federal district courts in New York State considered applications for preliminary injunctive relief that would restrain the State from enforcing its emergency rule requiring healthcare facilities to ensure that certain employees are vaccinated against COVID-19. *See* 10 N.Y.C.R.R. § 2.61 (Aug. 26, 2021) ("Prevention of COVID-19 transmission by covered entities") ("Section 2.61" or "the Rule"). The State issued the Rule in response to rapidly increasing infection rates related to the Delta variant of the SARS-CoV-2 virus, a virus that has caused widespread suffering in the State, country, and world since early 2020. The State described the Rule's purpose as primarily to preserve the health of healthcare workers, and from that narrow purpose, more broadly, to keep patients and the public safe from COVID-19. The Rule establishes a medical exemption to the vaccination requirement, but—consistent with New York's prior vaccination requirements for

healthcare workers—does not include an exemption based on religious belief. The Rule permits, but does not require, employers to make other accommodations for individuals who choose not to be vaccinated based on their sincere religious beliefs.

The moving parties—primarily healthcare workers allegedly affected by the Rule—challenge the Rule's omission of a religious exemption by asserting claims under the First Amendment, the Supremacy Clause, and the Fourteenth Amendment. Both groups of Plaintiffs moved to enjoin enforcement of the Rule. One district court granted the preliminary relief requested, enjoining the Rule insofar as it prevented healthcare workers from being eligible for an exemption based on religious belief; the other denied it. *See Dr. A. v. Hochul*, No. 21-cv-1009, 2021 WL 4734404 (N.D.N.Y. Oct. 12, 2021) (granting preliminary injunction) ("*Dr. A.*"); *We The Patriots USA, Inc. v. Hochul*, No. 21-cv-4954 (E.D.N.Y. Sept. 12, 2021) (denying preliminary injunction) ("*We The Patriots*" or "*WTP*").

The individual plaintiffs in *Dr. A.* are nurses, doctors, and other personnel employed by healthcare facilities in New York State; in *We The Patriots*, they are three nurses similarly employed and a related nonprofit organization. All individual plaintiffs aver that to receive any one of the three currently available vaccines against COVID-19 (Pfizer-BioNTech, Moderna, and Johnson & Johnson) would violate their religious beliefs because those vaccines were developed or produced using cell lines derived from cells obtained from voluntarily aborted fetuses. They assert that their employers have threatened them with adverse employment consequences if they refuse to be vaccinated.

Plaintiffs argue, and the district court in *Dr. A.* held, that they are likely to succeed in establishing that Section 2.61 violates their rights under the Free Exercise Clause of the First Amendment and under the Supremacy Clause. As to the Free Exercise Clause, Plaintiffs submit that because the State has afforded a medical

exemption to its requirement, the Free Exercise Clause requires the State also to afford a religious exemption. With respect to the Supremacy Clause, the *Dr. A.* Plaintiffs argue that the non-discrimination obligations placed on employers by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") preempt the State's vaccination Rule. As a third basis for relief, the *WTP* Plaintiffs allege that the Rule infringes their rights to privacy and bodily integrity under the Fourteenth Amendment. Under the familiar standards for a preliminary injunction that Plaintiffs must meet to obtain such relief, Plaintiffs allege that, in addition to showing a likelihood of success on the merits, they will suffer irreparable harm absent immediate relief and that the balance of the equities and the public interest lie in their favor.

The State resists, contending primarily that Section 2.61 is a neutral provision of general applicability to those covered by the Rule; that the Rule serves its goal and compelling need to preserve the health of healthcare workers; that the medical and religious exemptions would not be comparable for purposes of the Free Exercise Clause analysis required by *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), and its progeny; and that Plaintiffs have not shown a likelihood of success on the merits on any of their claims or otherwise satisfied the prerequisites for entry of the exceptional relief of a preliminary injunction at this phase of the litigation.

Following oral argument, on October 29, 2021, this Court entered an Order disposing of the appeals and advising that an Opinion would follow. This Opinion explains the basis for that Order.

As to Plaintiffs' Free Exercise claim, we conclude that Plaintiffs have not met their burden to show that they are likely to succeed in establishing (1) that Section 2.61 is not a neutral law of general applicability under *Smith*, or (2) that—in the resulting inquiry—Section 2.61 does not satisfy rational basis review. Next, we determine that

Plaintiffs have not demonstrated a likelihood of success on their Supremacy Clause claim on the record before us, as Plaintiffs have not shown that it would likely be impossible for employers to comply with both Section 2.61 and Title VII. Finally, we decide that Plaintiffs are not likely to succeed on their claim that the Rule contravenes the Fourteenth Amendment.

In light of these conclusions and of our further assessment of the irreparability of the harm Plaintiffs allege, the balance of the hardships, and the public interest in enforcing or not enforcing the Rule, we AFFIRM the order of the United States District Court for the Eastern District of New York denying the motion for a preliminary injunction in *We The Patriots*; and we REVERSE the order of the United States District Court for the Northern District of New York granting Plaintiffs' motion for the same relief in *Dr. A.* and VACATE the related preliminary injunction entered by that court. Finally, we REMAND both cases to their respective district courts for further proceedings consistent with our October 29, 2021 Order, and this Opinion. We stress that we do not now decide the ultimate merits of Plaintiffs' legal claims or of the State's defenses; rather, we make a limited determination with respect to preliminary relief based on the limited factual record presently before this Court.

## BACKGROUND

### I. New York's Emergency Rule

On August 26, 2021, New York's Department of Health adopted an emergency rule directing hospitals, nursing homes, hospices, adult care facilities, and other identified healthcare entities to "continuously require" certain of their employees to be fully vaccinated against COVID-19 beginning on September 27, 2021, for "general hospitals" and nursing homes, and on October 7, 2021, for all other "covered entities" as

defined in the Rule. 10 N.Y.C.R.R. § 2.61.[1] The vaccine requirement applies not to all employees, but only to those covered by the Rule's definition of "personnel": those employees, staff members, and volunteers "who engage in activities such that if they were infected with COVID-19, they could potentially expose other covered personnel, patients or residents to the disease." *Id.* § 2.61(a)(2).

The Rule was issued by the State's Public Health and Health Planning Council, a group of 25 healthcare professionals, including the Commissioner of Health, that state law charges with issuing regulations "affecting the security of life or health or the preservation and improvement of public health," including those addressing the control of communicable diseases. N.Y. Pub. Health L. § 225(4), (5).

As required by New York law, the notice of emergency rulemaking included the Council's findings and a Regulatory Impact Statement (the "Statement"). *See* NYS Admin. Proc. Act § 202(6). The Statement explained that the Rule responded to the "significant public health threat" caused by the increasing circulation of the Delta variant: "Since early July, cases have risen 10-fold, and 95 percent of the sequenced recent positives in New York State were the Delta variant." *Dr. A.* Sp. App'x at 39. It also referenced data purporting to show "that unvaccinated individuals are approximately 5 times as likely to be diagnosed with COVID-19 compared to vaccinated individuals" and that "[t]hose who are unvaccinated have over 11 times the risk of being hospitalized with COVID-19." *Id.* It described vaccination as critical to controlling the spread of the disease at healthcare facilities and in congregate care settings, which "pose increased challenges and urgency for controlling the spread of this disease because of [their] vulnerable patient and resident populations," determining that "[u]nvaccinated personnel in such settings have an unacceptably high

---

[1] The complete text of Section 2.61 is provided in an Appendix to this Opinion.

risk of both acquiring COVID-19 and transmitting the virus to colleagues and/or vulnerable patients or residents, exacerbating staffing shortages, and causing unacceptably high risk of complications." *Id.* As an emergency rule, Section 2.61 is in effect for a maximum of 90 days, expiring on November 23, 2021, unless renewed. *See id.* at 38; NYS Admin. Proc. Act § 202(6)(b).

Section 2.61 exempts from the vaccination requirement "personnel" for whom "immunization with COVID-19 vaccine is detrimental to [their] health . . . , based upon a pre-existing health condition" as more specifically defined and limited by the Rule. 10 N.Y.C.R.R. § 2.61(d)(1).[2] The medical exemption applies "only until such immunization is found no longer to be detrimental to [their] health." *Id.* It must be supported with a certification by a licensed physician or certified nurse practitioner issued in accordance

---

[2] The full text of this medical exemption under Section 2.61(d)(1) reads as follows:

> (1) Medical exemption. If any licensed physician or certified nurse practitioner certifies that immunization with COVID-19 vaccine is detrimental to the health of member of a covered entity's personnel, based upon a pre-existing health condition, the requirements of this section relating to COVID-19 immunization shall be inapplicable only until such immunization is found no longer to be detrimental to such personnel member's health. The nature and duration of the medical exemption must be stated in the personnel employment medical record, or other appropriate record, and must be in accordance with generally accepted medical standards, (see, for example, the recommendations of the Advisory Committee on Immunization Practices of the U.S. Department of Health and Human Services), and any reasonable accommodation may be granted and must likewise be documented in such record. Covered entities shall document medical exemptions in personnel records or other appropriate records in accordance with applicable privacy laws by: (i) September 27, 2021 for general hospitals and nursing homes; and (ii) October 7, 2021 for all other covered entities. For all covered entities, documentation must occur continuously, as needed, following the initial dates for compliance specified herein, including documentation of any reasonable accommodation therefor.

10 N.Y.C.R.R. § 2.61(d)(1).

with generally accepted medical standards, including recommendations of the Advisory Committee on Immunization Practices ("ACIP") of the U.S. Department of Health and Human Services. *Id.*; *see also* N.Y. State Department of Health, *Frequently Asked Questions (FAQs) Regarding the August 26, 2021 – Prevention of COVID-19 Transmission by Covered Entities Emergency Regulation*, https://coronavirus.health.ny.gov/ system/files/documents/2021/09/faqs-for-10-nycrr-section-2.61-9-20-21.pdf (last visited November 2, 2021) ("*FAQs*"). Section 2.61 contains no "exemption" for personnel who oppose vaccination on religious or any other grounds not covered by the medical exemption; however, as we discuss below, the Rule does not prohibit employers from providing religious objectors with accommodations.

On August 18, 2021, eight days *before* the Council promulgated Section 2.61, New York State Commissioner of Health Dr. Howard A. Zucker, acting alone, had issued an "Order for Summary Action" ("the August 18 Order" or "the Order") under the authority vested in him by New York Public Health Law § 16. *See Dr. A.* Sp. App'x at 41–47. Section 16 permits the Commissioner to issue a short-term order—effective for a maximum of 15 days—if he identifies a condition that in his view constitutes a "danger to the health of the people." N.Y. Pub. Health Law § 16. After making findings about the dangers of COVID-19, the Order similarly required certain healthcare facilities to ensure that certain personnel were fully vaccinated against COVID-19 by September 27, 2021, but differed from Section 2.61, which superseded it, in several respects. Most relevant here, the Order included a religious exemption for personnel who "hold a genuine and sincere religious belief contrary to the practice of immunization." *Dr. A.* Sp. App'x at 45–46. In addition, the Order could be effective for only a very brief period of time—for up to 15 days—whereas the Rule could be in effect for up to 90 days, subject to extensions. Further, the Order applied only to "general hospital[s]" and nursing homes; Section 2.61 applies more broadly, to all hospitals, nursing homes,

diagnostic and treatment centers, home healthcare agencies and similar programs, hospices, and adult care facilities. *Id.* at 43; 10 N.Y.C.R.R. § 2.61(a)(1).

In affidavits appended to its briefing to this Court and filed in other pending proceedings,[3] the State has provided preliminary vaccination data from the months of August through October 2021. It reflects a significant increase in vaccination rates among covered healthcare personnel that occurred after the Rule's effective date on September 27 (even though the Rule was subject to the temporary restraining order and later injunction issued in *Dr. A.*). As of August 24, the State's declarant reported, 71% of workers at nursing homes and 77% of workers at adult care facilities had received at least one dose of the vaccine; 77% of workers at hospitals were fully vaccinated. *See WTP* Appellees' Add. at 14–15 (Decl. of Elizabeth Rausch-Phung). As of October 19, 97.4% of workers at nursing homes and 96.7% of workers at adult care facilities had received at least one dose of the vaccine, and 91.4% of workers at hospitals were fully vaccinated. *See Serafin v. New York State Dep't of Health*, Index No. 908296-21, Doc. Nos. 56. (Decl. of Valerie A. Deetz), 57 (Decl. of Dorothy Persico) (Sup. Ct. Albany County Oct. 20, 2021). Also as of October 19, between 0.4% and 0.5% of workers at each facility

---

[3] We may take judicial notice of the existence of affidavits filed in another court. *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006). In addition, our Court has ruled that courts may consider hearsay evidence such as affidavits when determining whether to grant a preliminary injunction. *See Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010); *see also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (observing that preliminary injunctive determinations may be based on "procedures that are less formal and evidence that is less complete than in a trial on the merits"). Thus, we consider the State's data submitted in affidavits filed in other courts. Although this data was not before the district court in *WTP*—and therefore Plaintiffs have not had an opportunity to contest its accuracy before the district court—they have not raised such a concern in their reply brief in *WTP* or at oral argument, nor have they challenged this Court's ability to consider the State's submissions. More broadly, Plaintiffs do not appear to contest the State's assertion derived from this data that religious exemptions are more common than medical exemptions, but instead consider this fact irrelevant.

type were medically ineligible to receive the COVID-19 vaccine, whereas 1.9% of workers at nursing homes and adult care facilities and 1.3% of workers at hospitals claimed "other" exemptions, which the State describes as reflecting religious exemptions permitted by the injunction entered in *Dr. A. Id.*

## II.     The District Court Proceedings

Plaintiffs in *We The Patriots* are a membership organization and three nurses working in hospital facilities in New York State.[4] Plaintiffs in *Dr. A.* are nurses, doctors, and others employed at healthcare facilities in New York State. In both cases, the defendants include Governor Kathleen Hochul and Commissioner Zucker; the *Dr. A.* Plaintiffs also named New York Attorney General Letitia James as a defendant.

All Plaintiffs assert that they object on religious grounds to receiving the COVID-19 vaccines as briefly described above. As public health authorities have explained, in the 1970s and 1980s, cell lines were derived from fetal cells obtained from elective abortions or miscarriages.[5] These cell lines have since been used in the development of various vaccines.[6] They were used for testing in the research and development phase of

---

[4] Plaintiff We The Patriots USA, Inc., states that it is a section 501(c)(3) organization that "is dedicated to promoting constitutional rights and other freedoms through education, outreach, and public interest litigation, thereby advancing religious freedom, medical freedom, parental rights, and educational freedom for all." *WTP* App'x at 8.

[5] *See, e.g.*, Los Angeles County Dep't of Pub. Health, *COVID-19 Vaccine and Fetal Cell Lines* (Apr. 20, 2021), http://publichealth.lacounty.gov/media/coronavirus/docs/vaccine/ VaccineDevelopment_FetalCellLines.pdf; Michigan Dep't of Health & Human Servs., *COVID-19 Vaccines & Fetal Cells* (Apr. 21, 2021), https://www.michigan.gov/documents/coronavirus/ COVID-19_Vaccines_and_Fetal_Cells_031921_720415_7.pdf; North Dakota Dep't of Health, *COVID-19 Vaccines & Fetal Cell Lines* (Apr. 20, 2021), https://www.health.nd.gov/sites/www/ files/documents/COVID%20Vaccine%20Page/COVID-19_Vaccine_Fetal_Cell_Handout.pdf.

[6] These cell lines "have been used to create vaccines for diseases such as hepatitis A, rubella, and rabies. Abortions from which fetal cells were obtained were elective and were not done for the

the mRNA (Pfizer-BioNTech and Moderna) COVID-19 vaccines and in the production of the Johnson & Johnson COVID-19 vaccine.[7] Plaintiffs assert that, in these circumstances, receiving any of the three available COVID-19 vaccines would conflict with their deeply held religious beliefs.

A. *We The Patriots USA, Inc. v. Hochul*

In *We The Patriots*, the three individual plaintiffs are registered nurses. Diane Bono and Michelle Melendez are employed at Syosset Hospital in Syosset, and Michelle Synakowski is employed at St. Joseph's Hospital in Syracuse. On September 2, 2021, one week after the Rule was adopted, Plaintiffs sued Governor Hochul and Commissioner Zucker in the United States District Court for the Eastern District of New York, alleging that the Rule violates their First Amendment right to exercise their religion freely. They also charged that it violates their rights to privacy and "medical freedom," which they locate in the First, Fourth, Fifth, and Fourteenth Amendments. They asked the district

---

purpose of vaccine development." Los Angeles County Dep't of Pub. Health, *COVID-19 Vaccine and Fetal Cell Lines, supra* note 5.

[7] The use of these cell lines was explained in press statements and publicly available research during the development of the COVID-19 vaccines. *See* Press Release, Johnson & Johnson, Johnson & Johnson Announces a Lead Vaccine Candidate for COVID-19; Landmark New Partnership with U.S. Department of Health & Human Services; and Commitment to Supply One Billion Vaccines Worldwide for Emergency Pandemic Use (Mar. 30, 2020), https://www.jnj.com/johnson-johnson-announces-a-lead-vaccine-candidate-for-covid-19-landmark-new-partnership-with-u-s-department-of-health-human-services-and-commitment-to-supply-one-billion-vaccines-worldwide-for-emergency-pandemic-use (describing use of PER.C6 cell line in Johnson & Johnson vaccine); Annette B. Vogel et al., *A Prefusion SARS-Cov-2 Spike RNA Vaccine Is Highly Immunogenic and Prevents Lung Infection in Non-human Primates*, bioRxiv (Sept. 8, 2020), https://doi.org/10.1101/2020.09.08.280818 (referencing use of HEK293 cell line in early testing stages of Pfizer-BioNTech vaccine; Kizzmekia S. Corbett et al., *SARS-CoV-2 mRNA Vaccine Design Enabled by Prototype Pathogen Preparedness*, 586 Nature 567, 572 (Oct. 22, 2020), https://doi.org/10.1038/s41586-020-2622-0 (referencing use of HEK293 cell line in testing of Moderna vaccine).

court to declare Section 2.61 unconstitutional and permanently enjoin the State from enforcing it.

Ten days later, the *WTP* Plaintiffs moved for a temporary restraining order and a preliminary injunction immediately enjoining the State from enforcing the Rule. They argued that immediate relief was essential because Section 2.61 puts them at imminent risk of losing their jobs if they persist in refusing vaccination. In support of their motion, they provided letters from Nurse Bono's and Nurse Melendez's employer, Northwell Health, a private entity.[8] In the letter received by Nurse Bono, dated August 31, Northwell Health advised that her "continued employment will be at risk" if she did not receive the vaccine by the deadline. *WTP* App'x 32. In its letter to Nurse Melendez, dated August 30, Northwell Health wrote only that Nurse Melendez would be required to undergo weekly PCR testing and would be unable to participate in certain meetings, gatherings, and events based on her vaccination status.[9]

The district court denied Plaintiffs' motion on September 12, the day it was filed, without explanation and without ordering or receiving a response from the State. Plaintiffs timely appealed.

B.     *Dr. A. v. Hochul*

In *Dr. A.*, 17 medical professionals who work in New York sued Governor Hochul, Commissioner Zucker, and Attorney General James on September 13 in the United States District Court for the Northern District of New York, seeking declaratory

---

[8] They did not name Northwell Health as a defendant or seek relief against it.

[9] In their brief on appeal, the *WTP* Plaintiffs state that Northwell Health terminated Nurse Bono's employment on September 29. The *WTP* Plaintiffs also assert that Nurse Synakowski was informed by her employer that her employment would be terminated by September 21 if she was not vaccinated by then, but in their briefs filed since that date they have not stated whether that came to pass.

and injunctive relief preventing the enforcement of the Rule.[10] In their verified complaint, they alleged three bases of unconstitutionality. First, they contended that the Rule infringes on religious rights secured by the Free Exercise Clause by requiring that they be vaccinated, contrary to their religious beliefs. Second, they claimed that Section 2.61 violates the Supremacy Clause because it is preempted by Title VII, which prohibits discrimination in employment based on religion. Third, they claimed that Section 2.61 runs afoul of the Equal Protection Clause because it prevents them from seeking a religious accommodation while at the same time allowing similarly situated healthcare workers to seek a medical accommodation.

The *Dr. A.* Plaintiffs simultaneously moved for a temporary restraining order and preliminary injunction. They sought immediate injunctive relief, citing "imminent irreparable harm from loss of employment and professional standing" as a result of their "religiously motivated refusal to be vaccinated." *Dr. A.* App'x at 207.

On September 14, the district court granted Plaintiffs' motion for a temporary restraining order, enjoining the State from enforcing any requirement that employers deny religious exemptions from the vaccine requirement or that employers revoke any religious exemption already granted, and directed the State to file its opposition to Plaintiffs' request for a preliminary injunction. Six days later, the district court extended the temporary restraining order for 14 days, pending its written opinion on Plaintiffs' request for a preliminary injunction to be issued on or before October 12.

On October 12, the district court issued the requested preliminary injunction, resting in part on its determination that Plaintiffs were likely to succeed on their Free Exercise claim. The district court concluded that Plaintiffs had established that Section

---

[10] The district court granted a request by the *Dr. A.* Plaintiffs to proceed pseudonymously. The *Dr. A.* Plaintiffs do not identify their employers in their complaint.

2.61 is neither a neutral law nor one of general applicability. It also ruled that Section 2.61 is likely to fail strict scrutiny. *See Dr. A.*, 2021 WL 4734404, at \*8–9. The district court further concluded that Plaintiffs were likely to succeed on their Title VII preemption claim, reasoning that Section 2.61 "effectively foreclose[s] the pathway to seek[] a religious accommodation that is guaranteed under Title VII." *Id.* at \*6.[11]

The State timely appealed.[12]

## DISCUSSION

Issuance of a preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, at 129 (2d ed. 1995)). Preliminary injunctive relief "should not be routinely granted." *Hanson Tr. PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985) (quoting *Medical Soc. of State of N.Y. v.*

---

[11] The district court declined to consider the merits of Plaintiffs' Equal Protection claim. Plaintiffs do not pursue this claim on appeal.

[12] Having lost before the district court in the Eastern District on September 12—before the *Dr. A.* court entered its temporary restraining order (on September 14) or its preliminary injunction (on October 12)—the *WTP* Plaintiffs successfully sought interim relief from the September 28 motions panel in this Court. Motion Order, *WTP*, No. 21-2179, Dkt. No. 65 (Sept. 30, 2021). Oral argument on their appeal from the denial of a preliminary injunction was scheduled to be heard on an expedited basis on October 14 by a duly convened regular argument panel—the panel that now files this opinion per curiam. Case Calendaring, *WTP*, No. 21-2179, Dkt. No. 68. When the district court in the Northern District granted the *Dr. A.* Plaintiffs' request for a preliminary injunction on October 12, the State promptly appealed. Notice of Appeal, *Dr. A.*, No. 21-2566, Dkt. No. 1. Because the two cases request virtually identical relief and offer overlapping arguments, we determined not to hear the *WTP* Plaintiffs' appeal on October 14, separate from the State appeal in *Dr. A.*, but rather to hear the cases in tandem. We scheduled the combined oral argument for October 27, again on an expedited basis and with full briefing by the *Dr. A.* Plaintiffs and the State. Order, *WTP*, No. 21-2179, Dkt. No. 116; *Dr. A.*, No. 21-2566, Dkt. No. 8. The parties helpfully coordinated their oral argument presentations to avoid needless repetition.

*Toia*, 560 F.2d 535, 537 (2d Cir. 1977)). When deciding whether to issue a preliminary injunction, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

To obtain a preliminary injunction that "will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction."[13] *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020) (internal quotation marks omitted). The movant must also show that the balance of equities supports the issuance of an injunction. *See Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020). We review the grant or denial of a motion for a preliminary injunction for abuse of discretion. *See Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005). A district court has exceeded the permissible bounds of its discretion when its "decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding" or "cannot be located within the range of permissible decisions."

---

[13] In *Dr. A.*, the district court applied the likelihood-of-success standard, and the *Dr. A.* Plaintiffs do not now argue that this was error. The parties in *WTP*, in contrast, cite our Court's alternative, less demanding "serious questions" standard for obtaining preliminary injunctive relief, which authorizes injunctive relief if the movant has shown imminent irreparable harm as well as "sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (internal quotation marks omitted). But we have consistently applied the likelihood-of-success standard to cases challenging government actions taken in the public interest pursuant to a statutory or regulatory scheme, including in cases involving emergency regulations and orders. *See, e.g., Agudath Israel*, 983 F.3d at 631; *Alleyne v. New York State Educ. Dep't*, 516 F.3d 96, 99–101 (2d Cir. 2008). The *WTP* parties have not explained why the "serious questions" standard should nonetheless govern here. Accordingly, in our review of both appeals, we apply the likelihood-of-success standard.

*Mastrovincenzo v. City of New York*, 435 F.3d 78, 88 (2d Cir. 2006) (internal quotation marks omitted).

Because the issues and arguments presented by these two appeals overlap substantially, we consider them together, issue by issue, differentiating between them only as we think necessary.[14]

## I.    Likelihood of Success on the Merits: Free Exercise of Religion Claim

Plaintiffs contend that Section 2.61 violates their rights under the Free Exercise Clause of the First Amendment because it does not include an exemption for employees who oppose receiving the vaccine on religious grounds.

On a motion for preliminary injunction, the movants must show that they are likely to prevail on their claim that the challenged government action is unlawful. On the record before us, we conclude that neither the *Dr. A.* Plaintiffs nor the *WTP* Plaintiffs have established a likelihood of success on their Free Exercise claims such that they are entitled to the "extraordinary relief" of a preliminary injunction. The district court's conclusion to the contrary in *Dr. A.* was legal error and rested on clearly erroneous findings of fact.

### A.    The *Smith* Standard

The First Amendment forbids the enactment of laws, either state or federal, that "prohibit[] the free exercise" of religion.[15] U.S. Const., amend. I. But not all laws that

_____

[14] Although the district court's order denying the *WTP* Plaintiffs' motion did not state the basis for its decision, we may "affirm on any ground supported by the record." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476 (2d Cir. 2004).

[15] In relevant part, the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The stricture has been

burden an individual's exercise of religion contravene this deeply rooted prohibition. Nor do they always trigger heightened scrutiny. The Supreme Court has long applied the standard set out by Justice Scalia for the Court in *Employment Division v. Smith* to determine whether a democratically enacted law that burdens religious practice is properly considered under rational basis review or strict scrutiny. *See* 494 U.S. at 879; *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021).

Under *Smith*, a "neutral law of general applicability" is subject to rational basis review even if it incidentally burdens a particular religious practice. 494 U.S. at 878–79; *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). We have observed that "[t]he teaching of *Smith* is that a state can determine that a certain harm should be prohibited generally, and a citizen is not, under the auspices of her religion, constitutionally entitled to an exemption." *Central Rabbinical Congress of the U.S. & Canada v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 196 (2d Cir. 2014). But if a law is not neutral towards religion or is not generally applicable, it falls outside the boundaries of *Smith.* Then, for such a law to survive, it "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Lukumi*, 508 U.S. at 531–32.

Because they seek a preliminary injunction, Plaintiffs bear the initial burden of establishing a likelihood of success on the merits. In the context of their First Amendment claim, this means that Plaintiffs must show that they are likely to succeed on their claim that Section 2.61 is not a neutral or generally applicable rule. If they succeed at that step, the burden shifts to the State to show that it is likely to succeed in defending the challenged Rule under strict scrutiny. *Cf. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) ("[T]he burdens at the preliminary

---

held to limit the authorities of the states as well. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

injunction stage track the burdens at trial."). We conclude that, at this stage, Plaintiffs have not carried their initial burden of showing that Section 2.61 is likely not neutral or generally applicable.

B.    Neutrality

The State "fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. at 1877; *see also Lukumi*, 508 U.S. at 532 (First Amendment protections apply when "the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons"). A law may be not neutral if it explicitly singles out a religious practice, but even a facially neutral law will run afoul of the neutrality principle if it "targets religious conduct for distinctive treatment." *Lukumi*, 508 U.S. at 533–34.

The Supreme Court has explained that "[a] law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Id.* at 533. Section 2.61 is facially neutral because it does not single out employees who decline vaccination on religious grounds. It applies to all "personnel," as carefully defined in the Rule, aside from those who qualify for the narrowly framed medical exemption.

Plaintiffs nonetheless maintain that the regulation "targets" them because of their religious opposition to receiving any one of the three currently available COVID-19 vaccines. In support, they point to events preceding the enactment of Section 2.61 and to several of Governor Hochul's public comments during the month of September as reflective of discriminatory intent on the part of the State. We take these claims in order.

First, Plaintiffs argue that the fact that the August 18 Order contained a religious exemption, but Section 2.61 does not, demonstrates that in Section 2.61 the State intended to "target" those who object to vaccination on religious grounds, and that this reflects anti-religion animus. The district court in *Dr. A.* agreed, finding that the difference between the two government actions amounted to a "religious gerrymander." *Dr. A.*, 2021 WL 4734404, at *8 (quoting *Lukumi*, 508 U.S. at 535). Specifically, the district court determined that Section 2.61, enacted eight days after the August 18 Order, intentionally "amended the [August 18 Order] to eliminate the religious exemption." *Id.* As a result, the district court concluded that Plaintiffs had established a likelihood that Section 2.61 was non-neutral based on their argument that it "effectively targets religious opposition to the available COVID-19 vaccines." *Id.*

In *Lukumi*, the Supreme Court determined that the municipal ordinance at issue, which prohibited animal sacrifice, was not neutral because it effectively prohibited conduct only undertaken by adherents to the Santeria religion as a part of their religious practice. *See* 508 U.S. at 534–35. In contrast, Section 2.61 requires all covered employees who can safely receive the vaccine to be vaccinated. It applies whether an employee is eager to be vaccinated or strongly opposed, and it applies whether an employee's opposition or reluctance is due to philosophical or political objections to vaccine requirements, concerns about the vaccine's efficacy or potential side effects, or religious beliefs. The absence of a religious exception to a law does not, on its own, establish non-neutrality such that a religious exception is constitutionally required.

Further, that the August 18 Order contained a religious exemption, while Section 2.61 does not, falls short of rendering Section 2.61 non-neutral. The historical background of Section 2.61, to be determined following discovery, may be relevant to fully discerning the State's intent, but the evidence before the district courts failed to raise an inference that the regulation was intended to be a "covert suppression of

particular religious beliefs." *New Hope Family Servs., Inc. v. Poole*, 966 F.3d 145, 163 (2d Cir. 2020) (quoting *Lukumi*, 508 U.S. at 534). In suggesting that Section 2.61 "eliminated" the religious exemption, *WTP* Appellants' Br. at 10, Plaintiffs misconstrue the connection between the August 18 Order and the August 26 Rule.[16] The August 18 Order was issued by Commissioner Zucker alone as an emergency measure, intended to be in place for a maximum of 15 days, in response to reports of the surging Delta variant. Section 2.61, in contrast, was issued following collective deliberation by the 25-member Public Health and Health Planning Council under the emergency rulemaking procedures set forth in New York law, which provided more process, public input, and support for a measure that would be effective for 90 days subject to renewal. These procedures required the Council, among other things, to develop and issue specific findings and a regulatory impact statement. NYS Admin. Proc. Act § 202(6)(iv), (viii). After this extensive process, the full Council came to the conclusion that the vaccine requirement should apply to a broader set of healthcare entities and, consistent with the State's highly effective existing vaccine requirements for measles and rubella (issued with no religious exemption), *see* 10 N.Y.C.R.R. §§ 405.3, 415.26, 751.6, 763.13, 766.11, 794.3, 1001.11, should not contain a religious exemption. The Council did not amend the August 18 Order: rather, it independently promulgated a new Rule. The record before the district courts does not demonstrate that the Rule was intended to "target"

---

[16] In a recent decision, the First Circuit similarly misunderstood the connection between the August 18 Order and August 26 Rule when attempting to distinguish the New York vaccination mandate from the Maine vaccination mandate. *See Does 1-6 v. Mills*, — F.4th —, 2021 WL 4860328 (1st Cir. Oct. 19, 2021), *application for injunctive relief denied sub nom. Does 1-3 v. Mills*, — S. Ct. —, No. 21A90, 2021 WL 5027177 (Oct. 29, 2021). The First Circuit mistakenly wrote, "Eight days after New York officials promulgated a version of the regulation containing a religious exemption, they amended the regulation to eliminate the religious exemption." *Id.* at *9. However, as we explain above, there was no "amending" of the regulation to remove a religious exemption. Rather, the August 18 Order and the August 26 Rule were issued through two separate processes.

individuals opposed to receiving the COVID-19 vaccines because of their religious beliefs.

Additionally, much occurred in the time between August 18 and August 26: former Governor Andrew Cuomo resigned and Governor Hochul assumed office;[17] the FDA gave full approval to the Pfizer-BioNTech vaccine for individuals 16 years of age and older;[18] and the Delta variant continued its spread, becoming the dominant strain of the virus in the State.[19] Even if the differing August 18 and August 26 requirements can be said to represent a shift in the State's policy position, Plaintiffs have not adduced facts establishing that the change stemmed from religious intolerance, rather than an intent to more fully ensure that employees at healthcare facilities receive the vaccine in furtherance of the State's public health goals.[20]

Second, on appeal, Plaintiffs assert that certain comments made by Governor Hochul in September reveal that Section 2.61 was intended to target them because of their religious opposition to the required vaccination.[21] Some of those comments,

---

[17] New York State Governor's Office, Video, Audio, Photos & Rush Transcript: Kathy Hochul Is Sworn in as 57th Governor of New York State (Aug. 24, 2021), https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-kathy-hochul-sworn-57th-governor-new-york-state.

[18] Press Release, U.S. Food and Drug Administration, FDA Approves First COVID-19 Vaccine (Aug. 23, 2021), https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine.

[19] *See Dr. A.* Sp. App'x at 39.

[20] This is another area in which factual development can be expected to shed more light on the circumstances surrounding the creation of both the Order and the Rule and validate or disprove Plaintiffs' allegations.

[21] Governor Hochul made the statements at issue after both the *Dr. A.* Plaintiffs and the *WTP* Plaintiffs filed their preliminary injunction motions.

however, did not relate to Section 2.61 or workplace vaccine requirements at all, including Governor Hochul's statements at church services in which she urged those in attendance to get vaccinated.[22] Governor Hochul's expression of her own religious belief as a moral imperative to become vaccinated cannot reasonably be understood to imply an intent on the part of the State to target those with religious beliefs contrary to hers; otherwise, politicians' frequent use of religious rhetoric to support their positions would render many government actions "non-neutral" under *Smith*. At a press briefing on September 15, in which she responded to the temporary restraining order issued in *Dr. A.*, Governor Hochul stated her "personal opinion" that no religious exemption is required and that she was "not aware of" any "sanctioned religious exemption from any organized religion."[23] This comment simply mirrors the State's litigation position and conveys the fact—which Plaintiffs do not contest—that many religious leaders have stated that vaccination is consistent with their faiths.[24] Governor Hochul's comments may more reasonably be understood to express general support for religious principles

---

[22] *See* New York State Governor's Office, Rush Transcript: Governor Hochul Attends Service at Christian Cultural Center (Sept. 26, 2021), https://www.governor.ny.gov/news/rush-transcript-governor-hochul-attends-service-christian-cultural-center; New York State Governor's Office, Video, Audio, Photos & Rush Transcript: Governor Hochul Attends Services at Abyssinian Baptist Church in Harlem (Sept. 12, 2021), https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-hochul-attends-services-abyssinian-baptist-church.

[23] *See* New York State Governor's Office, Video & Rush Transcript: Governor Hochul Holds Q&A Following COVID-19 Briefing (Sept. 15, 2021), https://www.governor.ny.gov/news/video-rough-transcript-governor-hochul-holds-qa-following-covid-19-briefing.

[24] *See, e.g.*, Devin Watkins, *Pope Francis Urges People to Get Vaccinated Against Covid-19*, Vatican News (Aug. 18, 2021), https://www.vaticannews.va/en/pope/news/2021-08/popefrancis-appeal-covid-19-vaccines-act-of-love.html; Chairmen of the Committee on Doctrine and the Committee on Pro-Life Activities, *Moral Considerations Regarding the New COVID-19 Vaccines*, U.S. Conf. of Catholic Bishops (Dec. 11, 2020), https://www.usccb.org/moral-considerations-covid-vaccines.

that she believes guide community members to care for one another by receiving the COVID-19 vaccine.

Altogether, Governor Hochul's comments, even considered in light of the differing approaches taken by Commissioner Zucker in the August 18 Order and the full Council in the Rule, do not evince animosity towards particular religious practices or a desire to target religious objectors to the vaccine requirement *because of* their religious beliefs. Rather, they suggest that the State wanted more people to obtain the vaccine out of a deep concern for public health, which is a religion-neutral government interest.

We therefore conclude that Plaintiffs at this stage have not carried their burden of establishing that Section 2.61 is likely not neutral. The district court's contrary conclusion in *Dr. A.* was based on a clearly erroneous assessment of the record before it.

C.    General Applicability

As the Supreme Court recently explained in *Fulton v. City of Philadelphia*, a law may not be "generally applicable" under *Smith* for either of two reasons: first, "if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions"; or, second, "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." 141 S. Ct. at 1877 (internal quotation marks and alterations omitted). Here, Plaintiffs' argument, in substance, is that because Section 2.61 includes a medical exemption, it is not "generally applicable."

1.    *Whether Section 2.61 Permits "Comparable" Secular Conduct*

The general applicability requirement "protects religious observers against unequal treatment, and inequality that results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against

conduct with a religious motivation." *Central Rabbinical Congress*, 763 F.3d at 196–97

(alterations omitted) (quoting *Lukumi*, 508 U.S. at 542–43).[25] "A law is therefore not

generally applicable if it is substantially underinclusive such that it regulates religious

conduct while failing to regulate secular conduct that is at least as harmful to the

legitimate government interests purportedly justifying it." *Id.* at 197. As the Supreme

Court stated in a recent order, "whether two activities are comparable for purposes of

the Free Exercise Clause must be judged against the asserted government interest that

justifies the regulation at issue." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021).

"Comparability is concerned with the risks various activities pose." *Id.* Notably, in

*Smith*, a law criminalizing controlled substance possession was deemed generally

applicable even though it contained an exception for substances prescribed for medical

purposes. 494 U.S. at 874, 878–82.

      The State alleges that the following interests underlie its adoption of Section 2.61.

First, it seeks to prevent the spread of COVID-19 in healthcare facilities among staff,

patients, and residents. Second, by protecting the health of healthcare employees to

ensure they are able to continue working, it aims to reduce the risk of staffing shortages

that can compromise the safety of patients and residents even beyond a COVID-19

infection. Thus, the State maintains, the medical and any religious exemption differ in

---

[25] Plaintiffs suggest that our decision in *Central Rabbinical Congress* was overruled by the Supreme Court's orders in *Roman Catholic Diocese* and *Tandon*. But *Central Rabbinical Congress*'s formulation of the standard for identifying "comparable secular activity"—"secular conduct that is at least as harmful [as religious conduct] to the legitimate government interests purportedly justifying it," 763 F.3d at 197—is consistent with the Supreme Court's statements in both of those cases. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (stating that less-regulated factories, schools, and shopping centers were much more crowded than churches and synagogues or had contributed to the spread of COVID-19, in contrast to the religious institutions' "admirable safety records"); *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) (considering secular activities comparable where they were not found to "pose a lesser risk of transmission than [plaintiffs'] proposed religious exercise at home").

an important respect: applying the Rule to those who oppose vaccination on religious grounds furthers the State's asserted interests, whereas applying the Rule to those subject to medical contraindications or precautions based on pre-existing conditions would undermine the government's asserted interest in protecting the health of covered personnel. *Cf. Does 1-6 v. Mills*, — F.4th —, 2021 WL 4860328, at *6 (1st Cir. Oct. 19, 2021), *application for injunctive relief denied sub nom. Does 1-3 v. Mills*, — S. Ct. —, No. 21A90, 2021 WL 5027177 (Oct. 29, 2021). Vaccinating a healthcare employee who is known or expected to be injured by the vaccine would harm her health and make it less likely she could work. The State identified these objectives in the Regulatory Impact Statement accompanying the emergency rulemaking, and Plaintiffs do not point to any evidence suggesting that the interests asserted are pretextual or should otherwise be disregarded in the comparability analysis. Accordingly, the State makes a reasonable case that Section 2.61 contains a medical exemption not because it determined that "the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation," *Lukumi*, 508 U.S. at 543, but because applying the vaccination requirement to individuals with medical contraindications and precautions would not effectively advance those interests. Indeed, applying the vaccine to individuals in the face of certain contraindications, depending on their nature, could run counter to the State's "interest in protecting the integrity and ethics of the medical profession." *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997)); *see also Jacobson v. Massachusetts*, 197 U.S. 11, 38–39 (1905) (recognizing that the state may not be permitted to require vaccination of individuals with contraindications).

Importantly, the State has also presented evidence that raises the possibility that the exemptions are not comparable in terms of the "risk" that they pose. *See Tandon*, 141 S. Ct. at 1296. It notes that the medical exemption is defined to be limited in duration, as

the vaccine requirement is "inapplicable only until such immunization is found no longer to be detrimental to such personnel member's health." 10 N.Y.C.R.R. § 2.61(d)(1). Although some of the contraindications and precautions identified by ACIP and incorporated into the Department of Health guidance are long-term health conditions, others are in fact explicitly temporary, such as having a current moderate-to-severe acute illness.[26] In contrast, a sincerely held religious belief that vaccination is inconsistent with one's religion is unlikely to change to permit vaccination in the future, absent the approval of new vaccines that are developed in a different way. The statistics provided by the State further indicate that medical exemptions are likely to be more limited in number than religious exemptions, and that high numbers of religious exemptions appear to be clustered in particular geographic areas. *See Dr. A.* Appellants' Reply Br. at 13 (citing *Serafin*, Index No. 908296-21, Doc. No. 57 (Decl. of Dorothy Persico)) (ratios of religious exemptions to medical exemptions among Erie County and Monroe County hospital workers were 18 to 1 and 23 to 1, respectively).[27]

As a result, it may be feasible for healthcare entities to manage the COVID-19 risks posed by a small set of objectively defined and largely time-limited medical exemptions. In contrast, it could pose a significant barrier to effective disease prevention to permit a much greater number of permanent religious exemptions, which, according to the State's evidence, appear more commonly sought in certain locations. *See Serafin*, Index No. 908296-21, Doc. No. 57 (Decl. of Dorothy Persico). Although these differences may, after factual development, be shown to be too insignificant to render the exemptions incomparable, the limited evidence now before

_____

[26] *See FAQs, supra* at 10.

[27] As discussed, Plaintiffs do not contest the State's assertion that higher numbers of employees claim religious exemptions than medical exemptions. *See supra* note 3.

us suggests that the medical exemption is not "as harmful to the legitimate government interests purportedly justifying" the Rule as a religious exemption would be. *Central Rabbinical Congress*, 763 F.3d at 197.

In their efforts to show a likelihood of success on the merits, Plaintiffs counter that Section 2.61, by providing a medical but not a religious exemption, effectively prohibits religion-based refusals of vaccination while permitting "comparable" refusals on secular grounds. To establish comparability under *Smith*, Plaintiffs rely heavily on the general—and reasonable—proposition that any individual unvaccinated employee is likely to present statistically comparable risks of both contracting and spreading COVID-19 at any given healthcare facility, irrespective of the reason that the employee is unvaccinated. In Plaintiffs' view, the Supreme Court's orders in *Roman Catholic Diocese of Brooklyn v. Cuomo* and *Tandon v. Newsom* require us to confine our analysis to evaluating the risk of COVID-19 transmission posed by each unvaccinated individual.

Both of those cases involved challenges to occupancy limits placed on religious services, in an effort to curb COVID-19 transmission indoors, which were not applied to secular businesses with similarly high capacities. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020); *Tandon*, 141 S. Ct. at 1297. Unlike Plaintiffs' proposed analysis here, however, *Roman Catholic Diocese* and *Tandon* did not involve a one-to-one comparison of the transmission risk posed by an individual worshipper and, for example, an individual grocery shopper. The Supreme Court's discussion in those cases, which compared the risks posed by groups of various sizes in various settings, suggests the appropriateness of considering aggregate data about transmission risks. *See, e.g.*, *Roman Catholic Diocese*, 141 S. Ct. at 66–67 (comparing "a large store in Brooklyn that could literally have hundreds of people shopping there on any given day" with "a nearby church or synagogue [that] would be prohibited from allowing more than 10 or 25 people for a worship service"). We doubt that, as an epidemiological matter, the

number of people seeking exemptions is somehow excluded from the factors that the State must take into account in assessing the relative risks to the health of healthcare workers and the efficacy of its vaccination strategy in actually preventing the spread of disease. The record before us contains only limited data regarding the prevalence of medical ineligibility and religious objections, but what data we do have indicates that claims for religious exemptions are far more numerous.

Further, *Tandon* expressly instructs courts to consider "the asserted government interest that justifies the regulation at issue" when determining whether two activities are comparable for Free Exercise Clause purposes. *Tandon*, 141 S. Ct. at 1296. By confining their discussion of comparability to individual risk of transmission alone, Plaintiffs fail to engage with the reasons above, persuasive to us, that substantially distinguish the medically ineligible from the religious objectors in light of the State's asserted purposes. At this stage, Plaintiffs do not meaningfully challenge the legitimacy of the government's asserted interest in protecting the health of workers and maintaining staffing levels, or the proposition that requiring those who have been granted a medical exemption to be vaccinated would undermine those interests to a lesser degree than would a religious exemption.

As counsel for the *WTP* Plaintiffs acknowledged at oral argument, Plaintiffs here essentially contend that *all* existing vaccination mandates without a religious exemption necessarily fail the general applicability test because they likely all contain medical exemptions. At the same time, it appears that for decades, those charged with protecting the public health against infectious disease in New York State have required vaccination of *all* medically eligible employees and treated the requirement as a condition of employment in the healthcare arena. For example, the State has required healthcare employees to be vaccinated against rubella and measles since 1980 and 1991, respectively, without a religious exemption. Many of these vaccines, including the

rubella vaccine, appear from the information available to us (and not to date contested by Plaintiffs) to have connections to the same fetal cell lines that form the basis for Plaintiffs' religious objections here. *See* Los Angeles County Dep't of Pub. Health, *COVID-19 Vaccine and Fetal Cell Lines*, *supra* note 5. Thus, if accepted, Plaintiffs' arguments would go beyond just being inconsistent with past practices: they would have potentially far-reaching and harmful consequences for governments' ability to enforce longstanding public health rules and protocols.

With a record as undeveloped on the issue of comparability as that presented here, we cannot conclude that the above vaccination requirements are *per se* not generally applicable, as Plaintiffs' argument would have it, so as to support a preliminary injunction at this time. *See Smith*, 494 U.S. at 888–89 (counting "compulsory vaccination laws" among those generally applicable civic obligations for which no religious exemption is required); *see also Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944) ("[A parent] cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. The right to practice religion freely does not include liberty to expose the community or the child to communicable disease . . . ." (footnote omitted)); *Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015) (per curiam) (maintaining that religious exemptions to vaccine mandates are not constitutionally required).

The record before the district courts was sparse. It does not support a conclusion that Plaintiffs have borne their burden of demonstrating that the medical exemption provided in Section 2.61 and the religious exemption sought are likely comparable.

### 2. *Whether Section 2.61 Provides for a System of Individualized Exemptions*

General applicability may be absent when a law provides "a mechanism for individualized exemptions," *Smith*, 494 U.S. at 884, because it creates the risk that

administrators will use their discretion to exempt individuals from complying with the law for secular reasons, but not religious reasons. For instance, in *Smith*, the Supreme Court distinguished generally applicable laws from an unemployment compensation statute under which applicants were eligible for benefits if they presented "good cause" for their unemployment, which allowed administrators, in their discretion, to refuse an exemption if an applicant could not work for religious reasons, but to grant an exemption if an applicant could not work for other personal reasons. 494 U.S. at 884 (quoting *Bowen v. Roy*, 476 U.S. 693, 708 (1986) (plurality opinion) and citing *Sherbert v. Verner*, 374 U.S. 398, 401 & n.4 (1963)). The Court observed that the context of the unemployment compensation system "lent itself to individualized government assessment of the reasons for the relevant conduct." *Id.* Similarly, the Court recently found a system of individualized exemptions to exist where an official had "sole discretion" to grant or deny exemptions to the anti-discrimination provision in contracts between the City of Philadelphia and adoption service providers. *Fulton*, 141 S. Ct. at 1878–79.

As other Circuits have noted, however, "an exemption is not individualized simply because it contains express exceptions for objectively defined categories of persons." *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1187 (10th Cir. 2021) (internal quotation marks and alteration omitted); *see also Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1081–82 (9th Cir. 2015) (finding that the challenged "rules do not afford unfettered discretion that could lead to religious discrimination because the provisions are tied to particularized, objective criteria"), *cert. denied*, 136 S. Ct. 2433 (2016); *cf. Intercommunity Ctr. for Justice & Peace v. I.N.S.*, 910 F.2d 42, 45 (2d Cir. 1990) (concluding that immigration law that prohibited knowingly employing an unauthorized immigrant did "not provide for a discretionary exemption that is applied in a manner that fails to accommodate free exercise concerns" despite its inclusion of an exemption for

employing certain household employees hired before November 1986). The "mere existence of an exemption procedure," absent any showing that secularly motivated conduct could be impermissibly favored over religiously motivated conduct, is not enough to render a law not generally applicable and subject to strict scrutiny. *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 276 (3d Cir. 2007).

The *WTP* Plaintiffs argue that the medical exemption in Section 2.61 creates a mechanism for individualized exemptions. They are mistaken. The medical exemption here does not "'invite' the government to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton*, 141 S. Ct. at 1879 (quoting *Smith*, 494 U.S. at 884). Instead, the Rule provides for an objectively defined category of people to whom the vaccine requirement does not apply: employees who present a certification from a physician or certified nurse practitioner attesting that they have a pre-existing health condition that renders the vaccination detrimental to their health, in accordance with generally accepted medical standards, such as those published by ACIP,[28] for the period

---

[28] Under the generally accepted medical standards published by ACIP, cognizable contraindications to the COVID-19 vaccines are limited to "[s]evere allergic reaction (e.g., anaphylaxis) after a previous dose or to a component of the COVID-19 vaccine" and "[i]mmediate (within 4 hours) allergic reaction of any severity to a previous dose or known (diagnosed) allergy to a component of the COVID-19 vaccine." *FAQs, supra* at 10 (citing ACIP standards). Precautions to the vaccines are limited to "[c]urrent moderate to severe acute illness[,] . . . [h]istory of an immediate allergic reaction to any other (not COVID-19) vaccine or injectable therapy (excluding allergy shots)[, and] [h]istory of myocarditis or pericarditis after receiving the first dose of an mRNA COVID-19 vaccine." *Id.* (citing ACIP standards). Additionally, individuals with a "contraindication to one type of COVID-19 vaccine (e.g., mRNA COVID-19 vaccines) have precautions to another type of COVID-19 vaccine (e.g., Janssen/Johnson & Johnson vaccine)." *Id.* (citing ACIP standards). An individual who has a contraindication to the vaccine cannot be safely vaccinated, but "[m]ost people deemed to have a precaution to a COVID-19 vaccine at the time of their vaccination appointment can and should be administered vaccine" after conducting a risk assessment with a healthcare provider. Centers for Disease Control and Prevention, *Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Approved or Authorized in the United States: Contraindications and Precautions* (Oct. 25, 2021), https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-

during which the vaccination remains detrimental to their health. *See* 10 N.Y.C.R.R. § 2.61(d)(1). A written description of the nature and duration of the condition must be furnished, and the exemption must be documented. On its face, the Rule affords no meaningful discretion to the State or employers, and Plaintiffs have not put forth any evidence suggesting otherwise. For example, Plaintiffs have not plausibly alleged or offered evidence to suggest that employees are requesting, or that the State is allowing, medical exemptions that do not conform to the Rule or applicable standards.

That physicians and nurse practitioners must use their medical judgment to determine whether a particular individual has a contraindication or precaution against receiving the vaccine does not render the exemption discretionary. Indeed, *Smith* itself specifically held that a scheme that included a type of medical exemption—by not criminalizing the use of controlled substances when prescribed by a medical practitioner—was nonetheless generally applicable under the Free Exercise Clause. *See Smith*, 494 U.S. at 874. If the State can lawfully choose to apply the vaccination requirement to those with religious objections but not those medically unable to get vaccinated because the two are not comparable—and, as explained above, Plaintiffs have not established a likelihood of success on their argument to the contrary—then Section 2.61 appears to leave no room for the State to favor impermissible secular reasons for declining vaccination over religious reasons.[29]

---

vaccines-us.html#Contraindications. The specificity of these limitations stands in contrast to the absence of limitations and specificity in the medical exemption provided in the Maine statute recently subject to review and consideration by the Supreme Court. *See Mills*, 2021 WL 4860328, at *5 (construing Me. Rev. Stat. tit. 22, § 802); *Mills*, 2021 WL 5027177, at *2 (Gorsuch, *J.*, dissenting from the denial of application for injunctive relief) (stating that the law does not "limit what may qualify as a valid 'medical' reason to avoid inoculation").

[29] In *Dahl v. Bd. of Trustees of Western Michigan Univ.*, — F.4th —, 2021 WL 4618519 (6th Cir. Oct. 7, 2021) (per curiam), the Sixth Circuit, under different factual circumstances, ruled that a student-athlete vaccine mandate that provided that medical and religious exemptions would be

\* \* \*

Based on the foregoing, Plaintiffs have not established, at the preliminary injunction stage, that they are likely to succeed in showing that Section 2.61 is not neutral or generally applicable. Accordingly, rational basis review applies. *See Fulton*, 141 S. Ct. at 1876 (citing *Smith*, 494 U.S. at 878–82). Section 2.61 easily meets that standard, which requires that the State have chosen a means for addressing a legitimate goal that is rationally related to achieving that goal. *See Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third and Fourth Dep'ts, App. Div. of the Sup. Ct. of N.Y.*, 852 F.3d 178, 191 (2d Cir. 2017). Faced with an especially contagious variant of the virus in the midst of a pandemic that has now claimed the lives of over 750,000 in the United States and some 55,000 in New York, the State decided as an emergency measure to require vaccination for all employees at healthcare facilities who might become infected and expose others to the virus, to the extent they can be safely vaccinated. This was a reasonable exercise of the State's power to enact rules to protect the public health.[30] *See Jacobson*, 197 U.S. at 25; *Phillips*, 775 F.3d at 542–43.

---

considered on an individual basis at the discretion of the University meant that the school's vaccine mandate was not generally applicable under *Fulton*. *Id.* at *1, *4. We of course are not bound by that analysis, and we believe *Dahl* to have addressed a factual setting significantly different from that presented here. In *Dahl*, the University was afforded so much discretion to rule on individual cases, and so few standards governed the exercise of that discretion, as to leave room for the University to apply potentially discriminatory standards, or at least to avoid a neutral application of generally applicable principles. *See id.* at *4. Here, we think the standards articulated by ACIP and binding the State employers are sufficiently well-defined to avoid grossly pretextual or discriminatory application—and Plaintiffs have not met their burden to show that is not the case. Examined at a proper perspective—one suitable to dealing with large populations in a public health crisis—we see no basis for adopting the *Dahl* court's approach here.

[30] We also observe that, irrespective of whether Section 2.61 is ultimately upheld at the conclusion of this litigation, private healthcare institutions may impose vaccination requirements of their own, subject to any relevant limitations imposed by Title VII and other applicable law but regardless of the limitations that the First Amendment imposes on the State.

## II.    Likelihood of Success on the Merits: Supremacy Clause and Title VII Claim

The *Dr. A.* Plaintiffs contend that Section 2.61 contravenes the Supremacy Clause because it is preempted by Title VII, which prohibits discrimination in employment on the basis of religion. 42 U.S.C. § 2000e-2(a)(1)–(2). To succeed on this type of preemption claim, plaintiffs must show that "local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives." *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010).[31]

Plaintiffs construe Section 2.61 to prohibit healthcare employers from making reasonable accommodations as otherwise required by Title VII. Plaintiffs cite the absence of an express religious exemption in Section 2.61 in support of their position that the Rule simply leaves "no room for Plaintiffs' employers even to consider their reasonable religious accommodation requests as required by federal law under Title VII." *Dr. A.* Appellees' Br. at 29 (emphasis omitted).[32]

---

[31] "In general, three types of preemption exist: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives." *N.Y. SMSA Ltd. P'ship*, 612 F.3d at 104 (internal quotation marks omitted). Plaintiffs here invoke conflict preemption.

[32] Although the *Dr. A.* Plaintiffs style their preemption claim as a challenge brought pursuant to the Supremacy Clause, the Supreme Court has held that the Supremacy Clause does not create an independent cause of action. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015) ("[T]he Supremacy Clause is not the source of any federal rights, and certainly does not create a cause of action. It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so.") (internal quotation marks and citations omitted).

The District Court for the Northern District of New York agreed, ruling that Plaintiffs were likely to succeed on the merits of this claim. *See Dr. A.*, 2021 WL 4734404, at *6. The district court held that Section 2.61 "do[es] not make room for 'covered entities' to consider requests for reasonable religious accommodations," and instead requires all personnel at covered entities to be vaccinated. *Id.* The district court observed that the employers of some Plaintiffs had revoked previously afforded religious exemptions or religious accommodations to COVID-19-vaccine requirements, citing the State's adoption of Section 2.61. *Id.* In the district court's view, Plaintiffs adequately demonstrated that Section 2.61 "effectively foreclose[s] the pathway to seeking a religious exemption that is guaranteed under Title VII." *Id.*

Title VII makes it unlawful for employers "to discharge . . . or otherwise to discriminate against any individual" in his or her employment "because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). The statute defines "religion" to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate . . . an employee's . . . religious observance or practice without undue hardship on . . . the employer's business." *Id.* § 2000e(j); *see Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 66 (1977); *cf. EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 770 (2015).

The *Dr. A.* Plaintiffs argue, as described above, that the absence of a religious exemption in Section 2.61 prohibits them from seeking reasonable accommodations from their employers under Title VII for their sincerely held religious beliefs. Section 2.61 is silent, however, on the employment-related actions that employers may take in response to employees who refuse to be vaccinated for religious reasons. The State observes that "[n]othing in [Section 2.61] precludes employers from accommodating religious objectors by giving them . . . assignments—such as telemedicine—where they

would not pose a risk of infection to other personnel, patients, or residents." *Dr. A.*
Appellants' Br. at 62. We agree with the State.

Section 2.61, on its face, does not bar an employer from providing an employee
with a reasonable accommodation that removes the individual from the scope of the
Rule. Section 2.61 does not require employers to violate Title VII because, although it
bars an employer from granting a religious *exemption* from the vaccination requirement,
it does not prevent employees from seeking a religious *accommodation* allowing them to
continue working consistent with the Rule, while avoiding the vaccination requirement.
*See also Mills*, 2021 WL 4860328, at *10 ("The appellants' Supremacy Clause argument
rests on their assertion that the hospitals . . . have claimed that the protections of Title
VII are inapplicable in the State of Maine. The record simply does not support that
argument. . . . [T]he hospitals merely dispute that Title VII requires them to offer the
appellants the religious exemptions they seek." (internal quotation marks and alteration
omitted)).

Contrary to the *Dr. A.* Plaintiffs' interpretation of the statute, Title VII does not
require covered entities to provide the accommodation that Plaintiffs prefer—in this
case, a blanket religious exemption allowing them to continue working at their current
positions unvaccinated. To avoid Title VII liability for religious discrimination, an
employer "need not offer the accommodation the employee prefers." *Cosme v.
Henderson*, 287 F.3d 152, 158 (2d Cir. 2002). Instead, an employer must offer a *reasonable*
accommodation that does not cause the employer an undue hardship. Once "any
reasonable accommodation is provided, the statutory inquiry ends." *Id.* Because Section
2.61's text does not foreclose all opportunity for Plaintiffs to secure a reasonable
accommodation under Title VII, the Rule does not conflict with federal law. Therefore,
the district court's conclusion to the contrary constituted legal error.

The district court's conclusion also turned on clearly erroneous factual findings. At this stage, the *Dr. A.* Plaintiffs have submitted little in support of their broad allegations about the effect of Section 2.61. The district court reached the conclusion that accommodation by their employers was foreclosed upon the *Dr. A.* Plaintiffs' say-so, without any documentation supporting Plaintiffs' allegations that they were denied reasonable accommodations from their employers. The district court granted the *Dr. A.* Plaintiffs' motion for a preliminary injunction without a hearing and without knowing the identities of Plaintiffs' employers or the substance of Plaintiffs' interactions with their employers. It may turn out that the opportunities for a reasonable accommodation under Title VII for religious objectors to the vaccine are numerous, or it may be that there are so few as to be illusory. Perhaps accommodations for the medically ineligible leave few available for the religious objectors.[33] Or perhaps the requests for accommodations in each category will vary by employer, by part of the State, or by employee demographics. But without any data in the record, we cannot conclude that Plaintiffs have met their burden to show a likelihood of success on the merits, and we decline to draw any conclusion about the availability of reasonable accommodation based solely on surmise and speculation.

At this preliminary stage, we therefore conclude that the district court erred by finding that Plaintiffs are likely to succeed on their claim that Section 2.61 is preempted by Title VII and therefore violative of the Supremacy Clause.

---

[33] Although the Rule does not prevent healthcare entities from taking additional precautions to minimize the transmission risk posed by medically exempt employees, healthcare entities may permit a medically exempt employee to continue normal job responsibilities provided they comply with requirements for personal protective equipment. *See FAQs*, *supra* at 10.

## III. Likelihood of Success on the Merits: Rights to Privacy, Medical Freedom, and Bodily Autonomy Claim

The *WTP* Plaintiffs maintain on appeal that they are likely to succeed in establishing that Section 2.61 violates their fundamental rights to privacy, medical freedom, and bodily autonomy under the Fourteenth Amendment.[34] This argument also fails.

Both this Court and the Supreme Court have consistently recognized that the Constitution embodies no fundamental right that in and of itself would render vaccine requirements imposed in the public interest, in the face of a public health emergency, unconstitutional. *See Jacobson*, 197 U.S. at 25–31, 37; *Phillips*, 775 F.3d at 542–43. Plaintiffs' argument that the Supreme Court's decision in *Roman Catholic Diocese* "expressly overruled" *Jacobson* is a mystery, given that the majority did not even mention *Jacobson*. *WTP* Appellants' Br. at 35; *see generally Roman Catholic Diocese*, 141 S. Ct. 63.

Their alternative contention that *Jacobson* and *Phillips* have been implicitly overruled by the Supreme Court likewise finds no support in caselaw. In *Cruzan*, a case relied upon by Plaintiffs for the proposition that they have a fundamental constitutional right to refuse medical treatment, the Court expressly recognized its holding in *Jacobson* that "an individual's liberty interest in declining an unwanted smallpox vaccine" was outweighed there by "the State's interest in preventing disease." *Cruzan by Cruzan v.*

_____

[34] The *WTP* Plaintiffs' complaint describes these rights as arising from the First, Fourth, Fifth, and Fourteenth Amendments, but on appeal they assert that these rights are derived from either the Fourteenth Amendment alone or a combination of the First, Fourth, Fifth, Ninth, and Fourteenth Amendments. Because the *WTP* Plaintiffs do not make any particularized argument for why the fundamental rights they assert may be implicated by constitutional provisions other than the Fourteenth Amendment, we evaluate only their challenge as to the Fourteenth Amendment.

*Dir., Missouri Dep't of Health*, 497 U.S. 261, 278 (1990). Plaintiffs provide no basis for concluding that the vaccination requirement here, considerably narrower than the city-wide mandate in *Jacobson*, violates a fundamental constitutional right.[35] Although individuals who object to receiving the vaccines on religious grounds have a hard choice to make, they do have a choice. Vaccination is a condition of employment in the healthcare field; the State is not forcibly vaccinating healthcare workers. As in *Phillips*, the instant "challenge to the mandatory vaccination regime is therefore no more compelling than Jacobson's was more than a century ago." 775 F.3d at 542. *Cf. Klaassen v. Trs. of Indiana Univ.*, 7 F.4th 592, 593 (7th Cir. 2021) ("[S]uch [a substantive due process] argument depends on the existence of a fundamental right ingrained in the American legal tradition. Yet *Jacobson*, which sustained a criminal conviction for refusing to be vaccinated, shows that plaintiffs lack such a right.").

Accordingly, the *WTP* Plaintiffs have not established that they are likely to succeed on the merits of their Fourteenth Amendment claim.

## IV.    Irreparable Harm, the Public Interest, and the Balance of Equities

Plaintiffs are not entitled to a preliminary injunction because they cannot, on the present record, show a likelihood of success on the merits. We nonetheless briefly address the remaining preliminary injunction requirements: "irreparable harm absent

---

[35] Plaintiffs' reliance on *Roe v. Wade*, 410 U.S. 113 (1973), *Planned Parenthood v. Casey*, 505 U.S. 833 (1992), and *Lawrence v. Texas*, 539 U.S. 558 (2003), also fails to persuade. These cases do not establish a broad fundamental privacy right for all medical decisions made by an individual—and particularly not for a decision with such broad community consequences as declining vaccination against a highly contagious disease while working in contact with vulnerable people at healthcare facilities. This Court cannot find an overriding privacy right when doing so would conflict with *Jacobson*. Although in 1905, when it was decided, *Jacobson* might have been read more narrowly, for over 100 years it has stood firmly for the proposition that the urgent public health needs of the community can outweigh the rights of an individual to refuse vaccination. *Jacobson* remains binding precedent.

injunctive relief"; the "public interest weighing in favor of granting the injunction"; and "the balance of equities tip[ping] in [the movant's] favor," *Yang*, 960 F.3d at 127, and determine that Plaintiffs have not successfully met them.

A.     Irreparable Harm

The law recognizes the harm that necessarily results when the State unconstitutionally burdens religious exercise. "Religious adherents are not required to establish irreparable harm independent of showing a Free Exercise Clause violation because a presumption of irreparable injury flows from a violation of constitutional rights." *Agudath Israel*, 983 F.3d at 636 (internal quotation marks and alteration omitted); *see also Bery v. City of New York*, 97 F.3d 689, 693 (2d Cir. 1996) ("Violations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction."). Although Plaintiffs are subject to meaningful burdens on their religious practice if they choose to obtain the COVID-19 vaccine, because they have failed to demonstrate a likelihood of success on their First Amendment or other constitutional claims, their asserted harm is not of a constitutional dimension. Thus, Plaintiffs fail to meet the irreparable harm element simply by alleging an impairment of their Free Exercise right.

Plaintiffs also contend that they face imminent irreparable harm from loss of employment and professional standing if they refuse the COVID-19 vaccine on religious grounds. We acknowledge that Plaintiffs may possibly suffer significant employment consequences if they refuse on religious grounds to be vaccinated. It is well settled, however, that adverse employment consequences are not the type of harm that usually warrants injunctive relief because economic harm resulting from employment actions is typically compensable with money damages. *See Sampson v. Murray*, 415 U.S. 61, 91–92 (1974) ("[L]oss of income and . . . the claim that her reputation would be damaged . . . falls far short of the type of irreparable injury which is a necessary predicate to the

issuance of a temporary injunction[.]"); *Savage v. Gorski*, 850 F.2d 64, 68 (2d Cir. 1988) ("Since reinstatement and money damages could make appellees whole for any loss suffered during this period, their injury is plainly reparable and appellees have not demonstrated the type of harm entitling them to injunctive relief."). Because Plaintiffs' economic harms under Title VII could be remedied with money damages, and reinstatement is a possible remedy as well, we conclude that Plaintiffs have failed to demonstrate that they will suffer irreparable harm absent injunctive relief.

We pause to recognize, should the issue remain on remand, that this case raises difficult, apparently unusual questions as to imminent irreparable harm. Perhaps, if they prevail at the conclusion of this litigation, Plaintiffs would seek lost wages, but it is not at all clear who would pay them. To the extent Plaintiffs allege that they will suffer adverse employment consequences or loss of professional standing if not provided accommodations under Title VII, Plaintiffs might seek money damages from their employers. Private medical-provider employers might make a persuasive argument that they should not have to pay because they were in effect compelled by law to terminate the employment. Absent a waiver, however, sovereign immunity would likely prevent Plaintiffs from obtaining money damages from the State. *See Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011).

We emphasize, however, that we do not place any weight on the issue of remediation of Plaintiffs' financial losses at this preliminary injunction stage. The district courts can consider the issue, should it be necessary to do so, upon a determination of the permanent injunction request, presumably upon further factual development and findings.

B.     Public Interest and Balance of Equities

Plaintiffs have also failed to demonstrate that the public interest weighs in favor of enjoining enforcement of Section 2.61. When the government is a party to the suit, our inquiries into the public interest and the balance of the equities merge. *See New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020). Here, the State has an indisputably compelling interest in ensuring that the employees who care for hospital patients, nursing home residents, and other medically vulnerable people in its healthcare facilities are vaccinated against COVID-19, not just to protect them and those with whom they come into contact from infection, but also to prevent an overburdening of the healthcare system. Although Plaintiffs undoubtedly face a difficult choice if their employers deny religious accommodations—whether to be vaccinated despite their religious beliefs or whether to risk termination of their jobs—such hardships are outweighed by the State's interest in maintaining the safety within healthcare facilities during the pandemic.

Plaintiffs assert that the State "will suffer no harm as the New York healthcare system has operated for the last year without interruption or catastrophe" without requiring vaccination for healthcare workers. *WTP* Appellants' Br. at 11. Defining the relevant time frame in this way notably omits the first wave of the pandemic, during which New York hospitals were in crisis, with frontline nurses and physicians reportedly experiencing some of the highest rates of infection and death; New York City nursing homes experienced such a high number of deaths that their morgue capacity was exceeded. *See* Br. for *Amicus Curiae* Greater New York Hospital Association ("GNYHA *Amicus* Br.") at 3 (citing Miriam Mutambudzi et al., *Occupation and Risk of Severe COVID-19: Prospective Cohort Study of 120 075 UK Biobank Participants*, 78 Occupational & Envt'l Med. 307, 311 (2021)); New York State Office of the Attorney

General, *Nursing Home Response to COVID-19 Pandemic* 12 (Jan. 30, 2021),

https://ag.ny.gov/sites/default/files/2021-nursinghomesreport.pdf.

But even within the past year, healthcare facilities in the State have been under

strain. According to *amicus* Greater New York Hospital Association, not only has

transmission of the virus continued in hospitals even with the use of personal protective

equipment, testing, and other measures, *see* GNYHA *Amicus* Br. at 9, 12–14, but hospital

workers have also experienced a "parallel pandemic" of burnout, anxiety, depression,

and other mental health issues, *id.* at 16. Researchers have found that this phenomenon

stems from "a perceived lack of control, treatment of other healthcare workers for

COVID-19, and uncertainty about colleagues' infection status," and it has been

accompanied by increased rates of resignation and retirement as well as incidents of

self-harm. *Id.* at 16–17 (citing Ari Schechter et al., *Psychological Distress, Coping Behaviors,*

*and Preferences for Support among New York Healthcare Workers During the COVID-19*

*Pandemic*, 66 Gen. Hosp. Psychiatry 1, 3 (2020), https://www.ncbi.nlm.nih.gov/pmc/

articles/PMC7297159, and Wendy Dean, *Suicides of Two Health Care Workers Hint at the*

*COVID-19 Mental Health Crisis to Come*, STAT News (Apr. 30, 2020),

https://www.statnews.com/2020/04/30/suicides-two-health-care-workers-hint-at-covid-

19-mental-health-crisis-to-come), 19 (citing Bridget Balch, *"Worst Surge We've Seen":*

*Some Hospitals in Delta Hot Spots Close to Breaking Point*, AAMC (Aug. 24, 2021),

https://www.aamc.org/news-insights/worst-surge-we-ve-seen-some-hospitals-delta-

hot-spots-close-breaking-point).

Therefore, Plaintiffs have not demonstrated that "the balance of equities tips in

[their] favor." *Yang*, 960 F.3d at 127. Because Section 2.61 furthers the State's compelling

interest and Plaintiffs have not shown a likelihood of demonstrating that their

constitutional rights are violated by the Rule, they have also failed to show that a

preliminary injunction preventing the Rule's implementation serves the public interest.

Whether this issue will ultimately carry any weight when the district courts decide Plaintiffs' entitlement to a permanent injunction on remand, we need not and do not decide.

## CONCLUSION

For the foregoing reasons, the order of the United States District Court for the Eastern District of New York is **AFFIRMED**. The order of the United States District Court for the Northern District of New York is **REVERSED**, and the preliminary injunction entered by that court is **VACATED**. These tandem cases are **REMANDED** to their respective district courts for further proceedings consistent with the Order entered on October 29, 2021, and this Opinion.

**APPENDIX**

Section 2.61. Prevention of COVID-19 transmission by covered entities

&lt;Emergency action effective Aug. 26, 2021&gt;


(a) Definitions.

(1) *Covered entities* for the purposes of this section, shall include:

(i) any facility or institution included in the definition of "hospital" in section 2801 of the Public Health Law, including but not limited to general hospitals, nursing homes, and diagnostic and treatment centers;

(ii) any agency established pursuant to Article 36 of the Public Health Law, including but not limited to certified home health agencies, long term home health care programs, acquired immune deficiency syndrome (AIDS) home care programs, licensed home care service agencies, and limited licensed home care service agencies;

(iii) hospices as defined in section 4002 of the Public Health Law; and

(iv) adult care facility under the Department's regulatory authority, as set forth in Article 7 of the Social Services Law.

(2) *Personnel*, for the purposes of this section, shall mean all persons employed or affiliated with a covered entity, whether paid or unpaid, including but not limited to employees, members of the medical and nursing staff, contract staff, students, and volunteers, who engage in activities such that if they were infected with COVID-19, they could potentially expose other covered personnel, patients or residents to the disease.

(3) *Fully vaccinated*, for the purposes of this section, shall be determined by the Department in accordance with applicable federal guidelines and recommendations. Unless otherwise specified by the Department, documentation of vaccination must include the manufacturer, lot number(s), date(s) of vaccination; and vaccinator or vaccine clinic site, in one of the following formats:

(i) record prepared and signed by the licensed health practitioner who administered the vaccine, which may include a CDC COVID-19 vaccine card;

(ii) an official record from one of the following, which may be accepted as documentation of immunization without a health practitioner's signature: a foreign nation, NYS Countermeasure Data Management System (CDMS), the NYS Immunization Information System (NYSIIS), City Immunization Registry (CIR), a Department-recognized immunization registry of another state, or an electronic health record system; or

(iii) any other documentation determined acceptable by the Department.

(c) [FN1] Covered entities shall continuously require personnel to be fully vaccinated against COVID-19, with the first dose for current personnel received by September 27, 2021 for general hospitals and nursing homes, and by October 7, 2021 for all other covered entities absent receipt of an exemption as allowed below. Documentation of such vaccination shall be made in personnel records or other appropriate records in accordance with applicable privacy laws, except as set forth in subdivision (d) of this section.

(d) Exemptions. Personnel shall be exempt from the COVID-19 vaccination requirements set forth in subdivision (c) of this section as follows:

(1) Medical exemption. If any licensed physician or certified nurse practitioner certifies that immunization with COVID-19 vaccine is detrimental to the health of member of a covered entity's personnel, based upon a pre-existing health condition, the requirements of this section relating to COVID-19 immunization shall be inapplicable only until such immunization is found no longer to be

detrimental to such personnel member's health. The nature and duration of the medical exemption must be stated in the personnel employment medical record, or other appropriate record, and must be in accordance with generally accepted medical standards, (see, for example, the recommendations of the Advisory Committee on Immunization Practices of the U.S. Department of Health and Human Services), and any reasonable accommodation may be granted and must likewise be documented in such record. Covered entities shall document medical exemptions in personnel records or other appropriate records in accordance with applicable privacy laws by: (1) September 27, 2021 for general hospitals and nursing homes; and (ii) October 7, 2021 for all other covered entities. For all covered entities, documentation must occur continuously, as needed, following the initial dates for compliance specified herein, including documentation of any reasonable accommodation therefor.

(e) Upon the request of the Department, covered entities must report and submit documentation, in a manner and format determined by the Department, for the following:

(1) the number and percentage of personnel that have been vaccinated against COVID-19;

(2) the number and percentage of personnel for which medical exemptions have been granted;

(3) the total number of covered personnel.

(f) Covered entities shall develop and implement a policy and procedure to ensure compliance with the provisions of this section and submit such documents to the Department upon request.

(g) The Department may require all personnel, whether vaccinated or unvaccinated, to wear an appropriate face covering for the setting in which such personnel are working in a covered entity. Covered entities shall supply face coverings required by this section at no cost to personnel.

**Credits**

Emergency rulemaking eff. Aug. 26, 2021, expires Nov. 23, 2021.

[FN1]

So in original.

Current with amendments included in the New York State Register, Volume XLIII, Issue 40 dated October 6, 2021. Some sections may be more current, see credits for details.

N.Y. Comp. Codes R. & Regs. tit. 10, § 2.61, 10 NY ADC 2.61

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2021

(Argued: October 27, 2021    Decided: November 12, 2021)

Docket No. 21-2179

WE THE PATRIOTS USA, INC., DIANE BONO, MICHELLE MELENDEZ, MICHELLE SYNAKOWSKI,

*Plaintiffs-Appellants,*

–v.–

KATHLEEN HOCHUL, HOWARD A. ZUCKER, M.D.,

*Defendants-Appellees.*

Docket No. 21-2566

DR. A., NURSE A., DR. C., NURSE D., DR. F., DR. G., THERAPIST I., DR. J., NURSE J., DR. M., NURSE N., DR. O., DR. P., TECHNOLOGIST P., DR. S., NURSE S., PHYSICIAN LIAISON X.,

*Plaintiffs-Appellees,*

–v.–

KATHY HOCHUL, GOVERNOR OF THE STATE OF NEW YORK, IN HER OFFICIAL CAPACITY, DR. HOWARD A. ZUCKER, COMMISSIONER OF THE NEW YORK STATE

DEPARTMENT OF HEALTH, IN HIS OFFICIAL CAPACITY, LETITIA JAMES,
ATTORNEY GENERAL OF THE STATE OF NEW YORK, IN HER OFFICIAL CAPACITY,

*Defendants-Appellants.*

B e f o r e :

WALKER, SACK, and CARNEY, *Circuit Judges*.

———————

CAMERON L. ATKINSON (Norman A. Pattis, Earl A. Voss, *on
the brief*), Pattis & Smith, LLC, New Haven, CT, *for
Plaintiffs-Appellants We The Patriots USA, Inc. et al. (in
No. 21-2179).*

STEVEN C. WU, Deputy Solicitor General (Barbara D.
Underwood, Mark S. Grube, *on the brief*) *for* Letitia
James, Attorney General for the State of New York,
New York, NY, *for Defendants-Appellants (in No. 21-
2566) and Defendants-Appellees (in No. 21-2179) Kathleen
Hochul et al.*

CHRISTOPHER A. FERRARA (Michael McHale, Stephen M.
Crampton, *on the brief*), Thomas More Society,
Chicago, IL, *for Plaintiffs-Appellees Dr. A. et al. (in No.
21-2566).*

Alex J. Luchenister, Richard B. Katskee, Americans United
for Separation of Church and State, Washington, D.C.;
Daniel Mach, Heather L. Weaver, Lindsey Kaley,
American Civil Liberties Union Foundation,
Washington, D.C. & New York, NY; Christopher
Dunn, Beth Haroules, Arthur Eisenberg, Amy Belsher,
New York Civil Liberties Union Foundation, New
York, NY, *for Amici Curiae (in No. 21-2179) Americans
United for Separation of Church and State, American Civil
Liberties Union, New York Civil Liberties Union, Central
Conference of American Rabbis, Global Justice Institute,*

*Metropolitan Community Churches, Men of Reform Judaism, Methodist Federation for Social Action, Muslim Advocates, National Council of Jewish Women, Reconstructionist Rabbinical Association, Union for Reform Judaism, and Women of Reform Judaism.*

Mark D. Harris, Shiloh Rainwater, Proskauer Rose LLP, New York, NY, *for Amicus Curiae (in No. 21-2179) Greater New York Hospital Association.*

—————————

PER CURIAM:

We write to clarify our opinion in *We The Patriots USA, Inc. v. Hochul,* No. 21-2179, and *Dr. A. v. Hochul,* No. 21-2566, which we heard and decided in tandem. 2021 WL 5121983 (2d Cir. Nov. 4, 2021). We do so in light of the text of the recent order of the district court in *Dr. A. v. Hochul,* vacating the preliminary injunction at issue. No. 1:21-CV-1009 (N.D.N.Y. Nov. 5, 2021). The district court there wrote that the *Dr. A.* Plaintiffs "no longer need" a preliminary injunction because Section 2.61 "does not prevent employees from seeking a religious accommodation allowing them to continue working consistent with the Rule, while avoiding the vaccination requirement." *Id.* (quoting *We the Patriots USA, Inc.,* 2021 WL 5121983, at *17).

A reader might erroneously conclude from this text that, consistent with our opinion, employers may grant religious accommodations that allow employees to continue working, unvaccinated, at positions in which they "engage in activities such that if they were infected with COVID-19, they could potentially expose other covered personnel, patients or residents to the disease." 10 N.Y.C.R.R. § 2.61 (definition of "personnel"). In our opinion, however, we stated that "Section 2.61, on its face, does not bar an employer from providing an employee with a reasonable accommodation *that removes the individual from the scope of the Rule.*" 2021 WL 5121983, at *17 (emphasis added). In other words, it may be *possible* under the Rule for an employer to

*accommodate*—not *exempt*—employees with religious objections, by employing them in a manner that removes them from the Rule's definition of "personnel." *Id.* Such an accommodation would have the effect under the Rule of permitting such employees to remain unvaccinated while employed.

Of course, Title VII does not obligate an employer to grant an accommodation that would cause "undue hardship on the conduct of the employer's business." *See* 42 U.S.C. § 2000e(j). And, as we also observed in our opinion, "Contrary to the *Dr. A.* Plaintiffs' interpretation of the statute, Title VII does not require covered entities to provide the accommodation that Plaintiffs prefer—in this case, a blanket religious exemption allowing them to continue working at their current positions unvaccinated." 2021 WL 5121983, at *17. To repeat: if a medically eligible employee's work assignments mean that she qualifies as "personnel," she is covered by the Rule and her employer must "continuously require" that she is vaccinated against COVID-19. 10 N.Y.C.R.R. § 2.61. As we observed, this requirement runs closely parallel to the longstanding New York State requirements, subject to no religious exemption, that medically eligible healthcare employees be vaccinated against rubella and measles. 2021 WL 5121983, at *13.

The preliminary injunction entered by the district court in *Dr. A. v. Hochul* on October 12, 2021, has been vacated. *See We The Patriots USA, Inc. v. Hochul*, No. 21-2179, and *Dr. A. v. Hochul*, No. 21-2566, 2021 WL 5103443, at *1 (2d Cir. Oct. 29, 2021). New York State's emergency rule requiring that healthcare facilities "continuously require" that certain medically eligible employees—those covered by the Rule's definition of "personnel"—are vaccinated against COVID-19, is currently in effect. 10 N.Y.C.R.R. § 2.61. We caution further that our opinion addressed only the likelihood of success on the merits of Plaintiffs' claims; it did not provide our court's definitive determination of the merits of those claims.

In the interest of judicial economy, we direct the Clerk of Court to refer any further proceedings in these two matters to this panel.

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 29th day of October, two thousand twenty-one.

Before:    John M. Walker, Jr.,
           Robert D. Sack,
           Susan L. Carney,
                *Circuit Judges.*

---

We The Patriots USA, Inc., Diane Bono, Michelle
Melendez, Michelle Synakowski,

       Plaintiffs-Appellants,

          v.

Kathleen Hochul, Howard A. Zucker, M.D.,

        Defendants-Appellees.

**ORDER**

No. 21-2179

---

Dr. A., Nurse A., Dr. C., Nurse D., Dr. F., Dr. G.,
Therapist I., Dr. J., Nurse J., Dr. M., Nurse N., Dr. O., Dr.
P., Technologist P., Dr. S., Nurse S., Physician Liaison X.,

        Plaintiffs-Appellees,

          v.

Kathy Hochul, Governor of the State of New York, in her
official capacity, Dr. Howard A. Zucker, Commissioner of the
New York State Department of Health, in his official
capacity, Letitia James, Attorney General of the State of New
York, in her official capacity,

        Defendants-Appellants.

No. 21-2566

---

In No. 21-2179, Plaintiffs We The Patriots USA, Inc. et al., appeal from an order of the United States District Court for the Eastern District of New York denying their motion for a preliminarily injunction enjoining the State from enforcing N.Y. Comp. Codes R. & Regs. tit. 10, § 2.61 (August 26, 2021). Upon due consideration, it is hereby ORDERED, ADJUDGED, and DECREED that this Court's September 30, 2021 order granting a temporary injunction pending appeal is VACATED, the district court's order denying the motion for a preliminary injunction is AFFIRMED, and the case is REMANDED for further proceedings consistent with this Order and the forthcoming opinion of this Court.

In No. 21-2566, the State of New York appeals from an order of the United States District Court for the Northern District of New York enjoining the State from enforcing N.Y. Comp. Codes R. & Regs. tit. 10, § 2.61 (August 26, 2021). Upon due consideration, it is hereby ORDERED, ADJUDGED, and DECREED that the district court's order is VACATED and the case is REMANDED for further proceedings consistent with this Order and the forthcoming opinion of this Court.

The mandate shall issue forthwith for the limited purpose of vacating the injunction issued by the District Court for the Northern District of New York. An opinion in both No. 21-2179 and No. 21-2566 will follow expeditiously.

For the Court:
Catherine O'Hagan Wolfe, Clerk of Court