# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| WE THE PATRIOTS USA, INC., | : | |
| DIANE BONO, | : | |
| MICHELLE MELENDEZ, | : | Dkt. No.:1:21-cv-4954 (WFK) (RER) |
| MICHELLE SYNAKOWSKI, | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| KATHLEEN HOCHUL - GOVERNOR | : | |
| OF NEW YORK; HOWARD | : | |
| ZUCKER, M.D, - COMMISSIONER, | : | |
| NEW YORK STATE DEPARTMENT | : | |
| OF HEALTH | : | |
| Defendants. | : | FEBRUARY 22, 2022 |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' MOTION TO DISMISS THE PLAINTIFFS' COMPLAINT

THE PLAINTIFFS

NORMAN A. PATTIS, ESQ.
PATTIS & SMITH, LLC
383 Orange Street
New Haven, CT 06511
Tel:  (203) 393-3017
Fax: (203) 393-9745
npattis@pattisandsmith.com

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

FACTUAL BACKGROUND........................................................................................ 1

ARGUMENT ................................................................................................................ 3

   I.    There Is No Public Health Exception To The Individual Rights Secured By The United

   States Constitution. .................................................................................................. 4

   II.    The Court Should Deny The Defendants' Motion To Dismiss The Plaintiffs' Free

   Exercise Claim (Count One). .................................................................................. 9

      A.  The text of the First Amendment requires the Court to subject New York State Health

      Regulation § 2.61 to strict scrutiny. ...................................................................... 9

      B.  Even under *Smith*'s "neutral" and "general applicability" framework, New York State

      Health Regulation § 2.61 draws strict scrutiny, which it cannot survive. ........................... 11

      C.  The Plaintiffs have pled sufficient facts to enable them to survive a motion to dismiss

      with respect to their religious hostility claims. In the alternative, they will seek leave to

      amend. ................................................................................................................ 15

   III.    The Court Should Deny The Defendants' Motion To Dismiss The Plaintiffs' Privacy

   And Medical Freedom Claim (Count Two)............................................................ 16

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................... 3

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................... 3

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ............. 8, 11, 12

*City of Boerne v. Flores*, 521 U.S. 507 (1997) .............................................................. 9

*Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990) ............................... 18

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..................................................... 9

*Dr. A. v. Hochul*, 142 S.Ct. 552(Mem) (Dec. 13, 2021) ................................................. 3

*Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990) ............. 9, 11

*Fulton v. City of Philadelphia, PA*, 141 S.Ct. 1868 (2021) ...................................... 9, 12

*Gitlow v. New York*, 268 U.S. 652 (1925) ................................................................... 5

*Graziano v. Pataki*, 689 F.3d 110 (2d Cir. 2012) ......................................................... 3

*Griswold v. Connecticut*, 381 U.S. 479 (1965) ...................................................... 17, 19

*Harvest Rock Church, Inc. v. Newsom*, 141 S. Ct. 889(Mem) (2020) ............................... 5, 6, 7

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) ......................................................... 4

*Korematsu v. United States*, 323 U.S. 214 (1944) ....................................................... 6

*Lawrence v. Texas*, 539 U.S. 558 (2003) ................................................................... 7

*Lochner v. New York*, 198 U.S. 45 (1905) ................................................................. 6

*Marbury v. Madison*, 1 Cranch 137, 174 (1803) ......................................................... 18

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Com'n*, 138 S.Ct. 1719, 1731 (2018) ...... 15

*Phillips v. New York*, 775 F.3d 538 (2d Cir. 2015) ..................................................... 8

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) ............................... 5, 6, 7

*Sherbert v. Verner*, 374 U.S. 398 (1963) .................................................................. 10

*Tandon v. Newsom*, 141 S. Ct. 1294 (Apr. 9, 2021) .................................... 6, 7, 12, 13

*Union Pacific Railway Co. v. Botsford*, 141 U.S. 250 (1891) ..................................... 19

*United States v. Carolene Products Co.*, 304 U.S. 144 (1938) ...................................... 6

*Washington v. Davis*, 426 U.S. 229 (1976) ................................................................ 11

*We The Patriots USA, Inc., et al. v. Hochul, et al.*, 17 F.4th 266 (Nov. 4, 2021) ................ passim

*We The Patriots USA, Inc., et al. v. Hochul, et al.*, 17 F.4th 368 (Nov. 12, 2021) ........................ 4

*Winston v. Lee*, 470 U.S. 753 (1985) ......................................................................... 18

*Zucht v. King*, 260 U.S. 174 (1922) ......................................................................... 4, 5

**Other Authorities**

Fed. R. Civ. P. 12 ...................................................................................................... 1, 3

Fed. R. Civ. P. 25(d) ..................................................................................................... 1

Governor Hochul Attends Service at Christian Cultural Center (Sept. 26, 2021) ...................... 16

Governor Hochul Attends Services at Abyssinian Baptist Church in Harlem (Sept. 12, 2021) ... 16

Governor Hochul Holds Q&A Following COVID–19 Briefing (Sept. 15, 2021) ....................... 15

I Annals of Congress 439 (Gales and Seaton ed. 1834) ............................................... 19

In Preparation for Monday Vaccination Deadline, Governor Hochul Releases Comprehensive

   Plan to Address Preventable Health Care Staffing Shortage (Sept. 25, 2021) ......................... 16

N. Y. Const., Art. XXXVIII (1777) ............................................................................. 10

N.Y. State Dept. of Labor, Unemployment Insurance Top Frequently Asked Questions (Sept. 25,

   2021) ....................................................................................................................... 16

New York State Health Regulation § 2.61 .......................................................... 1, 2, 10

The Plaintiffs – We The Patriots USA, Inc.; Diane Bono; Michelle Melendez; and Michelle Synakowski – respectfully submit this memorandum of law in opposition to the Defendants'[1] motion to dismiss their Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

## FACTUAL BACKGROUND

The United States has resorted to a multitude of measures to combat COVID-19 and its variants since March 2020. By the summer of 2021, federal authorities and states, including New York, settled on vaccination as the best method to combat COVID-19. To carry out this determination, New York announced that it would promulgate a regulation for healthcare workers requiring them to receive a COVID-19 vaccination.

On August 16, 2021, then-New York Governor Andrew Cuomo announced that the new regulation would permit both religious and medical exceptions from the new COVID-19 vaccination requirement. Dkt. 2, ¶ 19. Cuomo resigned 8 days later, and Defendant Hochul assumed office as Governor of New York. *Id*. at ¶ 20. On August 26, 2021, the Defendants promulgated New York State Health Regulation § 2.61, which took effect immediately and, contrary to Governor Cuomo's promises, did not permit religious exemptions. *Id*. at ¶ 21.

§ 2.61 swept broadly. It imposed a COVID-19 vaccination mandate on

all persons employed or affiliated with a covered entity, whether paid or unpaid, including but not limited to employees, members of the medical and nursing staff, contract, staff, students, and volunteers, who engage in activities such that if they were infected with COVID-19, they could potentially expose other covered personnel, patients or residents to the disease.

*Id*. at ¶ 15.

---

[1] The Plaintiffs do not dispute that the substitution of Acting Commissioner of the New York State Department of Health Dr. Mary T. Bassett for Dr. Zucker is appropriate under Fed. R. Civ. P. 25(d).

Covered entites included "any facility or institution included in the definition of 'hospital'… including but not limited to general hospitals, nursing homes, and diagnostic and treatment centers…." *Id*. at ¶ 14.

§ 2.61 gave employers until September 27, 2021 or October 7, 2021 to ensure compliance among their personnel unless their personnel qualified for an exemption as allowed under § 2.61. *Id*. at ¶ 16. The only exemption allowed under § 2.61 is a "medical exemption." *Id*. at ¶ 17. Thus, § 2.61 categorically mandates the rejections of requests for religious exemptions. *Id*. at ¶ 30.

The elimination of the religious exemption promised by then-Governor Cuomo proved to be unconscionable for many healthcare workers, including individual Plaintiffs Bono, Melendez, and Synakowski as well as those represented by We The Patriots USA, Inc. The three major COVID-19 vaccine companies – Pfizer, Moderna, and Johnson & Johnson – used fetal cell lines developed from aborted fetuses to produce, manufacture, and test their COVID-19 vaccines. *Id*. at ¶ 9. Based on their sincerely held religious beliefs, the Plaintiffs object to abortion as morally wrong and believe that it would be morally wrong to take a vaccine that relies in whole or in part on the use of an aborted fetal cell line. *Id*. at ¶¶ 10-11. Their steadfast faithfulness in their religious convictions has cost them their careers as nurses in New York.

***Procedural History:***

On September 2, 2021, the Plaintiffs filed this action seeking injunctive relief to stay enforcement of New York State Health Regulation § 2.61. Dkt. 2. On September 12, 2021, they filed a motion for an emergency temporary restraining order and for a preliminary injunction. Dkt. 6. The Court denied that motion on September 12, 2021 without opinion. The Plaintiffs then sought relief from the Second Circuit, which ultimately declined to reverse the Court's denial of their motion for a preliminary injunction and a temporary restraining order. *We The Patriots USA, Inc.,*

*et al. v. Hochul, et al.*, 17 F.4th 266 (Nov. 4, 2021). They then sought relief from the United States Supreme Court, which also declined to grant preliminary injunctive relief. *See Dr. A. v. Hochul*, 142 S.Ct. 552(Mem) (Dec. 13, 2021).

The Defendants then filed a motion for a pre-motion conference on December 27, 2021, which the Court dispensed with. Dkt. 23, 24. Pursuant to the Court's December 27, 2021 order, the Defendants served their motion to dismiss on the Plaintiffs' counsel by email on January 26, 2021.

## **ARGUMENT**

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Plausibility is not a probability standard. In other words, a pleading must show, not merely allege, that the pleader is entitled to relief. *Id*. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the presumption of truth required by the motion to dismiss. *Id*. The Court, however, must accept all of the factual allegations in the operative complaint as true and draw all reasonable inferences in the Plaintiff's favor. *Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012).

The Second Circuit's decision in *We The Patriots USA, Inc., et al. v. Hochul, et al.*, 17 F.4th 266 (Nov. 4, 2021) does not mandate the Court's conclusions as to the Defendants' motion to dismiss. It must still apply the well-established motion to dismiss standard. In their motion to dismiss, the Defendants, however, convert the decision into outcome-determinative precedent

despite the Second Circuit specifically cautioning that its decision was not a definitive merits determination: "We caution further that our opinion addressed only the likelihood of success on the merits of Plaintiffs' claims; it did not provide our court's definitive determination of the merits of those claims." *We The Patriots USA, Inc., et al. v. Hochul, et al.*, 17 F.4th 368, 371 (Nov. 12, 2021) (clarifying its November 4, 2021 decision). The Second Circuit's opinions concerned a procedural posture – a preliminary injunction – where the Plaintiffs bore the burden of establishing a likelihood of success on the merits. *Hochul*, 17 F.4th at 281 (Nov. 4, 2021). Of particular concern to the Second Circuit was the lack of a fully-developed record – a product of the emergency nature of the relief that the Plaintiffs sought. *Id*. at 287-88, 294. The Plaintiffs no longer bear a burden to establish a likelihood of success on the merits, and they state claims sufficient to justify discovery for purposes of fact-finding.

## I.      There Is No Public Health Exception To The Individual Rights Secured By The United States Constitution.

Disputes over COVID-19 public health emergency measures invariably involve state litigants asserting that the United States Supreme Court has upheld the constitutionality of mandatory vaccination regimes, thus ending the litigation shortly after it begins. The Defendants assert the same argument based on a broad assertion of a police power to protect public health and safety. The Defendants' claim of a broad public health police power essentially seeks to create a public health exception to the individual rights secured by the United States Constitution. Their claim never stood on sound foundation even if they had made it 100 years ago, and modern precedent forecloses it.

The United States Supreme Court has reshaped its decisions in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) and *Zucht v. King*, 260 U.S. 174 (1922) over the last year. It has clearly established that, even during a public health emergency, the First Amendment's prohibition on the

attachment of special disabilities to religion still applies in full force. *See Harvest Rock Church, Inc. v. Newsom*, 141 S. Ct. 889(Mem) (2020) (granting certiorari and adopting *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) as its decision). In other words, a state's assertion of a public health emergency interest does not swallow the First Amendment even when it comes in the form of a vaccine mandate.

The U.S. Supreme Court has also indicated that *Jacobson* and *Zucht* involved assertions of different rights than the ones that the Plaintiffs assert here. As Justice Gorsuch pointed out in his *Cuomo* concurrence and as *Jacobson* itself makes clear, Henning Jacobson only asserted a generalized Fourteenth Amendment liberty interest claim in *Jacobson*, not a First Amendment claim, a suspect classification claim, or a claim of a fundamental unenumerated right. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 70 (2020) (Gorsuch, J., concurring). Justice Gorsuch then makes the following observation:

> Put differently, *Jacobson* didn't seek to depart from normal legal rules during a pandemic, and it supplies no precedent for doing so. Instead, Jacobson applied what would become the traditional legal test associated with the right at issue—exactly what the Court does today. Here, that means strict scrutiny: The First Amendment traditionally requires a State to treat religious exercises at least as well as comparable secular activities unless it can meet the demands of strict scrutiny— showing it has employed the most narrowly tailored means available to satisfy a compelling state interest.

*Id*. at 70.

Likewise, in *Zucht v. King*, 260 U.S. 174 (1922), Rosalyn Zucht only asserted a generalized Fourteenth Amendment liberty claim against a school vaccination mandate and a vague equal protection claim. The *Zucht* Court relied on *Jacobson* to reject her claim.

*Jacobson* and *Zucht* reflect the constitutional doctrine of their time. The Supreme Court did not begin to incorporate the Bill of Rights against the states until 1925 in *Gitlow v. New York*, 268 U.S. 652 (1925), and it did not recognize fundamental unenumerated rights as being protected

by the Fourteenth Amendment until *Lochner v. New York*, 198 U.S. 45 (1905). It also did not even discuss modern constitutional scrutiny doctrines until 1938 in *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n. 4 (1938), and it did not apply a form of scrutiny other than rational basis review until *Korematsu v. United States*, 323 U.S. 214 (1944).

Thus, when the Supreme Court decided *Jacobson* and *Zucht*, it had not given the First and Fourteenth Amendments the more robust protections that constitutional doctrine recognizes today. The controlling jurisprudence at the time meant that the Supreme Court did not examine unenumerated rights or enumerated rights guaranteed by the Fourteenth Amendment because it did not interpret the Fourteenth Amendment as protecting either form of individual rights. Even more notably, the litigants in *Jacobson* and *Zucht* did not even attempt to assert claims under the Bill of Rights or some sort of unenumerated rights theory within the Fourteenth Amendment, relying wholly on the argument that the Fourteenth Amendment protected a form of generalized liberty.

The Supreme Court did not revisit the scope of *Jacobson* and *Zucht* until last year. *See, e.g.*, *Tandon v. Newsom*, 141 S. Ct. 1294 (Apr. 9, 2021); *Harvest Rock Church, Inc. v. Newsom*, 141 S. Ct. 889(Mem) (2020); *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020). When it did revisit them, it limited their controlling authority to claims of generalized Fourteenth Amendment liberty. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020).

It, however, had already limited *Jacobson* and *Zucht* implicitly almost 20 years ago. The CDC described HIV/AIDS as a global pandemic in 2006,[2] and it was treated as a global pandemic since the 1980s.[3] According the CDC's statistics in 2018, gay and bisexual men accounted for

---

[2] https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5531a1.htm
[3] Michael H. Merson, *The HIV-AIDS Pandemic at 25 – The Global Response*, N. Engl. J. Med. (2006). https://www.nejm.org/doi/full/10.1056/nejmp068074

69% of new HIV diagnoses.[4] Despite HIV/AIDS being declared a global pandemic and the increased risk of the spread of HIV/AIDS among gays and bisexuals, the Supreme Court clearly established that states' police power does not permit them to criminalize homosexual intimacy, which is protected as a fundamental unenumerated right under the Fourteenth Amendment.[5] *Lawrence v. Texas*, 539 U.S. 558 (2003). If *Jacobson* and *Zucht* controlled as a rule of law, they would undoubtedly permit states to prohibit conduct that would spread HIV/AIDS with the threat of criminal consequences. However, as the Supreme Court recognized in *Lawrence*, modern constitutional jurisprudence does not permit the state to classify fundamental rights – enumerated or unenumerated – as forbidden fruit at which a mere nibble will result in criminal consequences. The Supreme Court did not cite or discuss *Jacobson* or *Zucht* once in its *Lawrence* opinion, and it did not address public health concerns either. *Lawrence v. Texas*, 539 U.S. 558 (2003).

*Lawrence* shows that *Jacobson* is out of place in modern constitutional jurisprudence and confirms its historical context as a pre-incorporation/unenumerated rights rule of law that has little to no application in modern constitutional jurisprudence. The Court should not give *Jacobson* and other decisions that rely on it dispositive weight over the Plaintiffs' free exercise claims or their privacy and medical freedom claims, and it should instead apply modern constitutional jurisprudence to scrutinize the Defendants' restrictions as the Supreme Court itself has done recently. *See, e.g.*, *Tandon v. Newsom*, 141 S. Ct. 1294 (Apr. 9, 2021); *Harvest Rock Church, Inc. v. Newsom*, 141 S. Ct. 889(Mem) (2020); *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020).

---

[4] https://www.cdc.gov/hiv/statistics/overview/ataglance.html
[5] Laurence H. Tribe, *Lawrence v. Texas: The "Fundamental Right" That Dare Not Speak Its Name*, 117 Harv. L. Rev. 1893 (2004).

The Second Circuit's decision in *Phillips v. New York*, 775 F.3d 538 (2d Cir. 2015) also does not succor the Defendants on this point. *Phillips* did not concern a vaccination mandate directly, but rather a temporary exclusion of unvaccinated children from school during a chickenpox outbreak, which this Court found to be constitutional. *Phillips*, 775 F.3d at 543. The Second Circuit stated in dicta that "New York could constitutionally require all children be vaccinated in order to attend public school. New York law goes beyond what the Constitution requires by allowing an exemption for parents with genuine and sincere religious beliefs." *Id*. at 543. It, however, also stated that the Supreme Court's dicta in *Prince* was "consonant" with the neutrality and general applicability tests established by *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). *Id*. at 543. Thus, despite its dicta, the Second Circuit never categorically relieved the Defendants of their obligations to comply with the "neutrality" and "general applicability" requirements of modern free exercise jurisprudence, much less considered a vaccination mandate that allowed secular exemptions but not religious ones.

Instead, the Second Circuit interpreted *Phillips* in a manner consistent with the Supreme Court's modern constitutional jurisprudence in *We The Patriots USA, Inc., et al. v. Hochul, et al.*, 17 F.4[th] 266, 287-88 (Nov. 4, 2021) by conducting a comparability analysis before citing *Phillips* to state a final conclusion that, unless the Plaintiffs carried their burden as to comparability, *Phillips* did not given them a general license to expose anyone to communicable disease through the practice of religion. Thus, *Phillips* does not relieve the Defendants of their responsibility to comply with the requirements of modern constitutional precedent. In other words, no precedent establishes a categorical public health exception to the individual rights secured by the Constitution.

8

II.   **The Court Should Deny The Defendants' Motion To Dismiss The Plaintiffs' Free Exercise Claim (Count One).**

A.   **The text of the First Amendment requires the Court to subject New York State Health Regulation § 2.61 to strict scrutiny.**

*Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990) has throttled the First Amendment-protected free exercise of religion since it overturned 30 years of precedent and rendered the Free Exercise Clause an anti-discrimination provision instead of the affirmative guarantee of religious liberty Congress intended. Until Justice Breyer retired, six sitting Supreme Court justices registered their view that *Smith* should be reexamined. *See Fulton v. City of Philadelphia, PA*, 141 S.Ct. 1868, 1889 (2021)[6] (Alito, J., concurring) (listing the justices who have called for reconsideration); *Fulton*, 141 S.Ct. at 1882-83 (Barrett, J., concurring) (expressing doubts as to *Smith*'s continued viability and reserving it for a proper case). Outraged by *Smith*, Congress twice acted with bipartisan virtual unanimity to pass laws to reverse *Smith*'s grave error, but the Supreme Court limited its efforts. *See City of Boerne v. Flores*, 521 U.S. 507 (1997). Congress's efforts, however, do not replace a proper interpretation of the Free Exercise Clause, and the text of the First Amendment precludes *Smith*.

The Free Exercise Clause bars states from making any law "prohibiting the free exercise of religion." Interpreted according to its "normal and ordinary… meaning" per *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Free Exercise Clause prohibits laws "forbidding or hindering unrestrained religious practices or worship." *Fulton*, 141 S.Ct. at 1896 (Alito, J., concurring) (sourcing the original "normal and ordinary" meaning of the Free Exercise Clause's text). This language grants those who wish to engage in the "exercise of religion" the right to do

---

[6] The Supreme Court granted certiorari to consider the question of whether *Smith* should be overruled in *Fulton*, but it did not reach it in its decision.

so without hindrance, and it does not condition that right on the treatment of others who are not exercising religion like *Smith* claims that it does.

Congress's intent to create an affirmative guarantee instead of a prohibition on non-discrimination becomes clear when considering constitutional language that does contain non-discrimination language. For instance, Art. I, § 9, cl. 6, provides that "[n]o Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another." Under Art. IV, § 2, cl. 1, "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." New York's 1777 constitution reinforces this point by its specific use of non-discrimination language. "[T]he free Exercise and Enjoyment of religious Profession and Worship, without Discrimination or Preference, shall forever hereafter be allowed within this State to all Mankind." N. Y. Const., Art. XXXVIII (1777). In other words, had Congress desired to create a *Smith*-style Free Exercise Clause, it had clear textual examples to model the Free Exercise Clause. It deliberately chose not to adopt *Smith*'s non-discrimination approach.

Thus, the Free Exercise Clause requires the application of the standard that *Smith* replaced: A law imposing a substantial burden on religious exercise can only survive scrutiny if it is narrowly tailored to serve a compelling government interest. *See Sherbert v. Verner*, 374 U.S. 398 (1963). The Plaintiffs recognize that traditional rules of *stare decisis* would counsel the Court to apply a *Smith* analysis, but the calls to overrule *Smith* from a majority of sitting Supreme Court justices weigh heavily in favor of the Court applying strict scrutiny as the Free Exercise's text requires.

There is no question that New York State Health Regulation § 2.61 imposes a substantial burden on the Plaintiffs' free exercise of their religious beliefs by categorically excluding them from almost every position in the field of healthcare on the basis of their religious beliefs. Dkt. 1, ¶ 30. A choice between the Plaintiffs' religious beliefs and the Plaintiffs' livelihood constitutes a

naked attempt to hinder the Plaintiffs' exercise of their religious beliefs, which the Free Exercise Clause clearly prohibits. Thus, the Free Exercise Clause requires § 2.61 to survive strict scrutiny, which places the burden on the Defendants to carry an evidentiary burden of showing (1) a compelling governmental interest and (2) a regulation that is narrowly tailored to fulfill that interest. *Washington v. Davis*, 426 U.S. 229, 242 (1976). They must carry that burden on a motion for summary judgment, not a motion to dismiss.

**B. Even under *Smith*'s "neutral" and "general applicability" framework, New York State Health Regulation § 2.61 draws strict scrutiny, which it cannot survive.**

Even assuming that *Smith*'s "neutral" and "general applicability" standard still controls this case, § 2.61 still draws strict scrutiny.

A law cannot qualify as neutral if a religious practice is the "object" of a law and not just "incidental[ly]" or unintentionally affected by it. *Smith*, 494 U.S. at 878. At the bare minimum, this requirement means that a law must not "discriminate on its face." *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 542 (1993). It also means that a law will not qualify as neutral if it is "specifically directed at… religious practice." *Smith*, 494 U.S. at 878.

While the Second Circuit did hold that § 2.61 is facially neutral "because it does not single out employees who decline vaccation on religious grounds," it did so in the context of deciding the Plaintiffs' application for injunctive relief where the Plaintiffs bore the burden of producing facts. *We The Patriots USA, Inc., et al. v. Hochul, et al.*, 17 F.4th 266, 283 (Nov. 4, 2021) ("Plaintiffs have not adduced facts establishing that the change stemmed from religious intolerance…."). Instead, the Second Circuit specifically held that the issue of "neutrality" was one that required "to shed more light on the circumstances surrounding the creation of both the Order and the Rule and validate or disprove Plaintiffs' allegations." *Id*. at 283 n.20. Thus, the

11

Second Circuit's decision does not mandate dismissal. It actually calls for further factual development, which the Plaintiffs are entitled to obtain through discovery.

The Plaintiffs have alleged sufficient facts on the neutrality prong. They have alleged an initial promise that they would be allowed to keep their religious exemptions before having them eliminated merely a week later. Dkt. 2, ¶¶ 19-21, 26. Why the Defendants conducted such a bait and switch goes directly to the "neutrality" of § 2.61, especially when § 2.61 does not mandate any safety precautions for medically exempt workers and allows these unvaccinated workers to work with the same exposed population that the law is ostensibly designed to protect. Thus, the Court should apply strict scrutiny on the neutrality prong, and it should permit the Plaintiffs to proceed with discovery.

"A law is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton v. City of Philadelphia*, 141 S.Ct. 1868, 1877 (Jun. 17, 2021). "A law also lacks general applicability if it permits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id*. While it is true that all laws are somewhat selective, the Supreme Court has held that specific "categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice." *Hialeah*, 508 U.S. at 542. Thus, if § 2.61 treats any comparable secular activity more favorably than religious exercise, the Defendants must satisfy strict scrutiny. *Tandon*, 141 S.Ct. 1296 (citing *Cuomo*, 141 S.Ct. at 67-68).

Additionally, in the context of the COVID-19 pandemic, *Tandon* establishes that "government regulations are not neutral and generally applicable, and therefore trigger scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more

favorably than religious exercise." 141 S.Ct. at 1296 (citing *Cuomo*, 141 S.Ct. at 67-68) (emphasis in original). In the context of the COVID-19 pandemic, *Cuomo* and *Tandon* both establish that "comparability" examines whether secular and religious activities pose the same risks to spreading COVID-19. *Cuomo*, 141 S.Ct. at 67; *Tandon*, 141 S.Ct. at 1296. Their emphasis on "*any comparable secular activity*" does not permit the consideration of collective impact, but rather of the individual risk posed by individualized exemption. No question exists that an unvaccinated person poses a risk of contracting and spreading COVID-19. COVID-19 will not walk up to an unvaccinated person, tap them on the shoulder, and ask them why they are not vaccinated before infecting them. It will not ask them why they are not vaccinated before it turns them into pollinators. In other words, unvaccinated individuals who assert a religious exemption pose the same risks that unvaccinated individuals who assert a medical exemption do.

Thus, exacerbating § 2.61's failure to be generally applicable is that § 2.61 does not mandate safety precautions for individuals who are medically exempted from the COVID-19 vaccination requirement. § 2.61(a)(2) defines the people that the regulation seeks to regulate and why:

> "Personnel," for the purposes of this section, shall mean all persons employed or affiliated with a covered entity, whether paid or unpaid, including but not limited to employees, members of the medical and nursing staff, contractstaff, students, and volunteers, who engage in activities such that if they were infected with COVID-19, they could potentially expose other covered personnel, patients or residents to the disease.

Under this definition, the clear intent of § 2.61 is to separate the unvaccinated from patients or coworkers who work with patients. The medical exemption, however, defeats this purpose on its face. It renders the COVID-19 vaccination mandate inapplicable to a medically exempt person and leaves it to an employer's discretion on whether to isolate them: "any reasonable accommodation may be granted…." § 2.61(d)(1). In other words, § 2.61 permits unvaccinated

13

healthcare workers to care for patients because they are medically exempt, but not because they are religiously exempt. This distinction facially destroys the "general applicability" of § 2.61 because it treats religious exemptions differently than medical exemptions when both pose the same risk of harm to the Defendants' governmental interests.

The Plaintiffs acknowledge that the Second Circuit stated that the Defendants might be able to show that § 2.61 satisfies the comparability analysis because the number of medical exemptions sought and granted are significantly less than the number of religious exemptions sought and granted. *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 286 (2d Cir. 2021). They have three rejoinders though.

First, *Tandon* and its predecessors do not play a numbers game. Laws regulate individuals. Rights protect individuals. The appropriate comparison is a one-to-one comparison between an individual seeking a religious exemption and one seeking a secular exemption.

Second, the Second Circuit considered a limited evidentiary record that it acknowledged needed further factual development. *Id*. On this motion to dismiss, the Court is not considering a factual record. It is considering the Plaintiffs' complaint. Whatever the Defendants' reasons for promulgating § 2.61 are, they do not drive the Court's decision on this motion, and they are properly explored in discovery and decided on a motion for summary judgment.

Third, the Defendants could have easily vitiated their interests by capping the number of exemptions granted at each facility instead of categorically denying religious exemptions. They chose not to, and that alone dooms § 2.61 under the narrow tailoring prong of a strict scrutiny analysis. For almost two years, public health officials have bandied about the term "herd immunity," but the Defendants have not even sought to articulate what vaccination threshholds will enable them to meet their public health goals in healthcare facilities.

In other words, even if the Court does not agree with the Plaintiffs' argument that § 2.61 must survive strict scrutiny, factual questions still exist, at the very least, as to the harm religious exemptions cause to the Defendants' public health interests. Those factual questions are properly decided after factual development through discovery and on a motion for summary judgment. Thus, the Court should deny the Defendants' motion to dismiss Count One.

### C. The Plaintiffs have pled sufficient facts to enable them to survive a motion to dismiss with respect to their religious hostility claims. In the alternative, they will seek leave to amend.

The Defendants claim that the Plaintiffs have not sufficiently pled facts sufficient to establish a "special hostility" to religion claim as part of Count One, which would mandate a permanent injunction. *See Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Com'n*, 138 S.Ct. 1719, 1731 (2018). The Plaintiffs do not concede that their complaint is fatally deficient in that respect as its allegations of a "bait-and-switch" and the categorical exclusion of people of faith from the healthcare field in New York leave ample room to explore the motivations for those actions. Dkt. 2, ¶¶ 26, 30. If the Court finds that their complaint is factually deficient in that respect, the Plaintiffs will seek leave to amend, and they proffer the following additional facts:

Defendant Hochul acknowledged on September 15, 2021 that the Defendants "left off [the religious exemption] in our regulations intentionally." *See* Governor Hochul Holds Q&A Following COVID–19 Briefing (Sept. 15, 2021).[7] When asked why, Defendant Hochul answered that there is no "sanctioned religious exemption from any organized religion" and that organized religions are "encouraging the opposite."[8] *Id*. She then added that "everybody from the Pope on down is encouraging people to get vaccinated." *Id*.

---

[7] https://www.governor.ny.gov/news/video-rough-transcript-governor-hochul-holds-qa-following-covid-19-briefing
[8] This comment alone raises an Establishment Clause issue under the First Amendment.

Prior to these comments, Defendant Hochul rhetorically questioned the sincerity of religious objections to the COVID-19 vaccine on September 12, 2021: "How can you believe that God would give a vaccine that would cause you harm? That is not truth. Those are just lies out there on social media." *See* Governor Hochul Attends Services at Abyssinian Baptist Church in Harlem (Sept. 12, 2021).[9]

On September 26, 2021, Defendant Hochul claimed to have a direct line to God: "All of you, yes, I know you're vaccinated, you're the smart ones, but you know there's people out there who aren't listening to God and what God wants. You know who they are." *See* Governor Hochul Attends Service at Christian Cultural Center (Sept. 26, 2021).[10]

Finally, on September 25, 2021, the Defendants altered New York's unemployment insurance scheme to render healthcare workers who were fired for not complying with the vaccination requirements ineligible for unemployment benefits. *See* In Preparation for Monday Vaccination Deadline, Governor Hochul Releases Comprehensive Plan to Address Preventable Health Care Staffing Shortage (Sept. 25, 2021);[11] *see also* N.Y. State Dept. of Labor, Unemployment Insurance Top Frequently Asked Questions (Sept. 25, 2021).[12]

### III.   The Court Should Deny The Defendants' Motion To Dismiss The Plaintiffs' Privacy And Medical Freedom Claim (Count Two).

The Supreme Court unequivocally established a fundamental right to privacy in the First, Fourth, Fifth, Ninth, and Fourteenth Amendments in *Roe v. Wade* and prior decisions. *See Roe v.*

---

[9] https://governor.ny.gov/news/video-audio-photos-rush-transcript-governor-hochul-attends-servces-abyssinian-baptist-church
[10] https://governor.ny.gov/news/rush-transcript-governor-hochul-attends-service-christian-cultural-center
[11] https://www.governor.ny.gov/news/preparation-monday-vaccination-deadline-governor-hochul-releases-comprehensive-plan-address
[12] https://dol.ny.gov/unemployment-insurance-top-frequently-asked-questions

*Wade*, 410 U.S. 113, 152-53 (1973) (listing the sources of the right to privacy and including the First, Fourth, Fifth, Ninth, and Foureenth Amendments); *see also Griswold v. Connecticut*, 381 U.S. 479, 484 (1965) (stating that the specific guarantees of the Bill of Rights contain emanating penumbras that give them life and substance). While its precedents only covered matters pertaining to marriage, procreation, contraception, family relationships, and child rearing and education, the *Roe* Court refrained from confining it to just those areas. *Id*. at 152-53. The *Roe* Court then elaborated on the medical nature of the decision that a woman must make on whether to elect an abortion:

> This right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, as we feel it is, or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy. The detriment that the State would impose upon the pregnant woman by denying this choice altogether is apparent. Specific and direct harm medically diagnosable even in early pregnancy may be involved. Maternity, or additional offspring, may force upon the woman a distressful life and future. Psychological harm may be imminent. Mental and physical health may be taxed by child care. There is also the distress, for all concerned, associated with the unwanted child, and there is the problem of bringing a child into a family already unable, psychologically and otherwise, to care for it. In other cases, as in this one, the additional difficulties and continuing stigma of unwed motherhood may be involved. All these are factors the woman and her responsible physician necessarily will consider in consultation.

*Id*. at 153.

The Supreme Court then reaffirmed its decision in *Planned Parenthood v. Casey*, 505 U.S. 833 (1992) and described the choice on whether to get an abortion as one of the "most intimate and personal choices that a person may make in a lifetime, choices central to personal dignity and autonomy." *Id*. at 851. Although the *Casey* Court located the right to an abortion under a Fourteenth Amendment liberty theory, it did not cast doubt on *Roe's* formulation of the right as a right to privacy. *Id*. at 852-853.

These decisions establish the decision to terminate a pregnancy is inherently a private medical decision. While the *Roe* Court cited *Jacobson* for the proposition that the fundamental right to privacy did not completely remove conduct from state regulation, it held that states could only regulate the right when its interest became compelling and its regulations must be narrowly tailored. *Roe*, 410 U.S. at 154-56. In other words, *Roe* required state regulations that burden private medical decisions to survive strict scrutiny under the Fourteenth Amendment.

If the right to elect a medical procedure to terminate the life of another being is a fundamental constitutional right, the right to decline a vaccination or other medical treatment is also a fundamental constitutional right with similar roots in the Supreme Court's precedents. *See Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990) (holding that there is a fundamental constitutional right to refuse medical treatment); *see also Winston v. Lee*, 470 U.S. 753 (1985) (considering a criminal defendant's interest in his own medical decisions when prosecutors sought a court order to force him to undergo surgery to retrieve a bullet for evidence). The only difference between the two is that the former actually terminates the life of another being while the latter only poses a risk of infection to other human beings. Like the right to abortion, the right to decline a vaccination is not an unlimited right, but one that is entitled to be protected by strict scrutiny.

Additionally, federal courts have given little attention to the Ninth Amendment, which protects unenumerated fundamental rights that people enjoy. The Supreme Court has held that "[i]t cannot be presumed that any clause in the constitution is intended to be without effect." *Marbury v. Madison*, 1 Cranch 137, 174 (1803). James Madison – the author of the Ninth Amendment – introduced it to assuage the concerns raised by critics of the Bill of Rights, who feared that the enumeration of specific rights would eliminate other rights traditionally held by the people. I

18

Annals of Congress 439 (Gales and Seaton ed. 1834) ("It has been objected also against a bill of rights, that, by enumerating particular exceptions to the grant of power, it would disparage those rights which were not placed in that enumeration; and it might follow by implication, that those rights which were not singled out, were intended to be assigned into the hands of the General Government, and were consequently insecure"). Justice Goldberg suggested that the appropriate test for determining whether the Ninth Amendment protects a fundamental personal right is to "look to the traditions and [collective] conscience of our people to determine whether a principle is so rooted [there] as to be ranked as fundamental." *Griswold*, 381 U.S. at 493 (Goldberg, J., concurring) (internal quotation marks and citation omitted).

Under Justice Goldberg's test, the Supreme Court has already decided that the common law right of medical freedom (bodily self-determination or privacy) is a right so rooted in our nation's history and tradition as to be ranked fundamental: "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestioned authority of law." *Union Pacific Railway Co. v. Botsford*, 141 U.S. 250, 251 (1891). Thus, Count Two of the Plaintiffs' complaint has a strong foundation in the Ninth Amendment in addition to the Fourteenth Amendment.

*We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266 (Nov. 4, 2021) does not mandate dismissal of Count Two in this procedural posture. Before the Second Circuit, the Plaintiffs bore the burden of proof that they were likely to succeed on the merits. *Id*. at 293. Thus, the Second Circuit held that both it and "the Supreme Court have consistently recognized that the Constitution embodies no fundamental right that in and of itself would render vaccine requirements imposed in the public interest, in the face of a public health emergency, unconstitutional." *Id*. at 293.

While the Second Circuit decision did reject the Plaintiffs' argument that *Roe*, *Casey*, and *Lawrence* establish a broad fundamental privacy right for all medical decisions made by an individual, it did not address *Botsford* because the Plaintiffs did not discover *Botsford* until the normal progress of appellate litigation sharpened their arguments. *Id*. at 293 n.35. *Botsford* unequivocally establishes the broad fundamental privacy and liberty right for medical decisions that the Second Circuit did not feel comfortable recognizing in *Roe*, *Casey*, and *Lawrence*. It remains good law today, and, as discussed previously, *Jacobson* and its progeny are not "plenary overrides" to constitutional rights. *Casey*, 505 U.S. at 857.

The motion to dismiss standard now becomes outcome-determinative for purposes of this motion to dismiss. The Plaintiffs have supplied controlling precedents demonstrating a fundamental unenumerated right to make their own medical decision free from the Defendants' compulsory meddling. While the Second Circuit stated that the Defendants are not forcibly vaccinating healthcare workers, the Defendants are constructively trying to by making New York healthcare workers, including the Plaintiffs, choose between putting food on the table and their liberties. *Sambrano v. United Airlines, Inc.*, No. 21-11159, pp. 18-19 (5th Cir. Feb. 17, 2022). The heavy burden that § 2.61 imposes on a fundamental constitutional right shifts the burden to the Defendants to satisfy strict scrutiny.

Satisfying strict scrutiny is a summary judgment question – a factual question to be decided after evidence has been gathered and presented to the Court in a final application for a permanent injunction. As discussed previously, § 2.61 cannot survive strict scrutiny because there are ways where the Defendants can tailor their "solutions" for preventing the spread of COVID-19 while respecting the Plaintiffs' rights – i.e., restricting them to working with low-risk patients while

testing often and wearing the same personal protective equipment that they did throughout the entire COVID-19 pandemic.

For now, the Plaintiffs have stated a fundamental constitutional right to medical freedom, and that is sufficient to enable Count Two of their Complaint to survive a motion to dismiss.

THE PLAINTIFFS
/s/ Norman A. Pattis /s/
NORMAN A. PATTIS, ESQ.
PATTIS & SMITH, LLC
383 Orange Street
New Haven, CT 06511
Tel:  (203) 393-3017
Fax: (203) 393-9745
npattis@pattisandsmith.com

### CERTIFICATE OF SERVICE

I hereby certify that on the date above a copy of the foregoing was served by certified mail, email, and/or by fax upon Governor Hochul and Dr. Zucker or their proper representatives designated by law.

/s/ Norman A. Pattis /s/
NORMAN A. PATTIS, ESQ.